RECORD NO. 14-1067

In The

# United States Court of Appeals

### For The Fourth Circuit

## CHARLES E. CHERRY; JOSEPH L. PRYOR,

*Plaintiffs – Appellants,*

**and**

**LAWRENCE ALEXANDER, JR.; ELLIS ALLEN; MITCHELL ALSTON; FRANCIS R. BANKS; AHMED BLAKE; MICHAEL O. BRODIE; KEVIN E. CHANDLER; ERNEST CUTHBERTSON; DARRIN DAVIS; STEVEN A. EVANS; WILLIAM GRAVES; MILFORD J. HARRIS; JONATHAN HEARD; ANTUAN HINSON; STEPHEN L. HUNTER; BRIAN JAMES; DEMETRIUS W. JOHNSON; JOHN O. LEGRANDE; GEORGE M. LITTLE; DARRELL MCDONALD; C. L. MELVIN; STACY A. MORTON, JR.; WILLIE PARKER; LARRY PATTERSON, JR.; WILLIAM A. PHIFER; NORMAN RANKIN; WAYNE REDFERN; ALEXANDER RICKETTS; RONALD ROGERS; STEVEN SNIPES; CALVIN STEVENS, JR.; ERIC STEVENSON; JERMEIR JACKSON-STROUD; JULIUS TUNSTALL; ALLEN WALLACE; FRANK YOUNG; MICHAEL WAYLAND WALL,**

*Plaintiffs,*

**v.**

## THE CITY OF GREENSBORO,

*Defendant – Appellee.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA AT GREENSBORO**

―――――――――

**SUPPLEMENTAL APPENDIX**

―――――――――

**Patrick M. Kane**
SMITH MOORE LEATHERWOOD, LLP
**Wells Fargo Tower**
**300 North Greene Street, Suite 1400**
**Greensboro, North Carolina 27401**
**(336) 378-5200**

*Counsel for Appellee*

# TABLE OF CONTENTS

**Appendix Page**

**Defendant's Brief in Support of Its Motion for
Summary Judgment**
> **filed August 15, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**Defendant's Reply Brief in Support of Its Motion for
Summary Judgment**
> **filed September 13, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **45**

**Plaintiffs' Joint Response in Opposition to Motion s for
Summary Judgment of Defendants City of Greensboro,
Wray, Brady, and Sanders on Discrimination Claims**
> **filed September 27, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **68**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No.: 1:09cv934

| | |
|---|---|
| LAWRENCE ALEXANDER JR., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| THE CITY OF GREENSBORO, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT CITY OF GREENSBORO'S
BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

NATURE OF THE MATTER ................................................................. 1

STATEMENT OF FACTS .................................................................... 1

QUESTIONS PRESENTED ................................................................. 4

STANDARD OF REVIEW .................................................................. 5

ARGUMENT AND CITATIONS OF AUTHORITY ......................... 5

   I.   PLAINTIFFS CANNOT SATISFY THE ELEMENTS
   OF AN ACTIONABLE HOSTILE WORK
   ENVIRONMENT CLAIM ............................................................ 5

      A.   Plaintiffs Cannot Show That Alleged Harassment
      Was Based on Race. ................................................................ 12

      B.   Plaintiffs Cannot Show "Severe or Pervasive"
      Racial Harassment. ................................................................. 12

   II.   THE CITY IS ENTITLED TO SUMMARY
   JUDGMENT BASED ON THE *FARAGHER/ELLERTH*
   AFFIRMATIVE DEFENSE. ......................................................... 38

      A.   The First Prong of the Affirmative Defense is
      Satisfied. ................................................................................ 38

      B.   The Second Prong of the Affirmative Defense is
      Satisfied. ................................................................................ 40

CONCLUSION ................................................................................. 40

CERTIFICATE OF SERVICE ........................................................... 42

Pursuant to the 5 August 2013 Order, Defendant the City of Greensboro ("the City") respectfully submits this brief in support of its Motion for Summary Judgment.

## NATURE OF THE MATTER

This action was commenced on 7 December 2009. On 15 March 2010 Plaintiffs filed an Amended Complaint. The City filed a Motion to Dismiss. This Court dismissed the claims of Plaintiffs Alston, Blake, Patterson, Jr., Young, and D. Stevenson, dismissed Plaintiffs' disparate treatment claims with the exception of Plaintiffs Evans and Alexander, and dismissed Plaintiffs' retaliation claims. The City answered and moved for judgment on the pleadings. This Court denied the motion and allowed all hostile work environment claims and Alexander's and Evans' disparate treatment claims to proceed.

This case was consolidated for discovery with a case asserting different causes of action by the same Plaintiffs against the City and other Defendants (Case No. 09-CV-293) and a Title VII case against the City by Julius Fulmore (Case No. 09-CV-373). In discovery the City produced over 40,000 pages of documents and more than 100 audio recordings and the parties took depositions of close to 60 witnesses. On 5 August 2013 Plaintiffs Evans and Alexander voluntarily dismissed their disparate treatment claims with prejudice. The only remaining claims against the City are hostile work environment claims with respect to all remaining Plaintiffs.

## STATEMENT OF FACTS

The 35 Plaintiffs remaining in this action are African-American and were employed with the Greensboro Police Department ("GPD") when David Wray and Randall Brady were Chief and Deputy Chief, respectively. (Am. Compl. ¶¶ 46-47.)

1

David Wray was hired as GPD Chief of Police in July 2003. Ex. 1 at 21-22. Plaintiffs allege that "beginning with the hiring of Wray as Chief," a hostile work environment resulted for Plaintiffs. (Am. Complt. ¶ 114.) The hostile work environment allegedly was created by Wray, Brady, and Scott Sanders. *Id.* at ¶¶ 48-49, 63, 66, 73-74, 78, 81, 84, 92, 95, 101, 106-107, 114; Doc. No. 103, p. 6 (alleging that "at the core of every Plaintiff's claim is the establishment of common facts regarding former Chief Wray, his Deputy Chief Brady, and their minion, Officer Sanders," and "the racial hostility that is at issue in this action derives from common sources: Defendants (sic) Wray and Brady[1], and, at least with respect to the investigations of black officers, Sanders.") The allegations against Sanders relate to his tenure in the Special Intelligence Section of GPD and to activities conducted at the direction of Wray and Brady. (Am. Complt. ¶¶ 69, 72-74, 95, 101; Doc. No. 103, pp. 2-4.) Brady retired on 1 December 2005, Wray resigned on 9 January 2006, and Sanders left Special Intelligence as of 12 January 2006.[2] Thus, the relevant time period is July 2003 to 12 January 2006.

When Wray was named Chief, Special Intelligence was one of two units in the Special Investigations Division, along with Internal Affairs ("IA"). Ex. 2, at 28-29. Ex. 3 at 31. Special Intelligence and IA each had a Sergeant, and the Division had a Captain. Around September 2004, Special Intelligence was moved to the Metropolitan Operations Bureau, and its Sergeant then reported to Deputy Chief Brady, who previously had been the Captain over Special Intelligence. Ex. 2 at 28-30; Ex. 3 at 15-16. This move changed

---

[1] Wray and Brady are not Defendants in this case.
[2] These dates have been judicially established by this Court's Order in a different action. (Case No. 09-CV-293, Doc. No. 75, pp. 29-36.)

2

only one level of the chain of command for SID. Ex. 4 at 209. Throughout discovery and depositions, the term "SID" has been used to refer to Special Intelligence, regardless of its location in the organization. *See, e.g.,* Ex. 2 at 28-29; Ex. 3 at 31-33. Plaintiffs' claims are based in large part on alleged activities of SID. (Am. Complt. ¶¶ 67-83.)

Both before and after Wray was named Chief, Special Intelligence conducted criminal investigations of GPD officers. Ex. 5 at 121-23; Ex. 1 at 208-09; Ex. 6 at 7-8. Those investigations were also sometimes conducted by the Criminal Investigations Division or Vice/Narcotics. Ex. 1 at 208-09; Ex. 6 at 7-8. At the conclusion of a criminal investigation, findings were typically presented to the DA for a charging decision. Ex. 7 at 46-48; Ex. 6 at 85-86; Ex. 4 at 40-42. IA would also typically review the matter for potential administrative violations. Ex. 8 at 30-33.

One of Plaintiffs' main allegations relates to alleged use of photo lineups. (Am. Complt. ¶¶ 48-67.) Specifically, Plaintiffs allege that Wray and Brady directed police officers to create lineup books and a digital photo array that included Plaintiffs' pictures. (Am. Complt. ¶¶ 48-49). They further allege that the lineups were created for the purpose of framing black officers and that this created a hostile work environment. *Id.* Plaintiffs also allege that SID "targeted" African-American officers for investigation, specifically referencing an investigation into the bachelor party of Officer James Hinson. (Am. Complt. ¶ 83.) Plaintiffs further allege that SID tried to entrap officers and inappropriately monitored Plaintiffs computers and emails. (Am. Complt. ¶¶ 84, 101-04.)

In June 2005, an investigation of Officer James Hinson became public knowledge when Hinson found a tracker on his police vehicle. Many Plaintiffs allege that the

3

discovery of the tracker was concerning.  Ex. 9, pp. 25, 29, 31, 48, 50, 73.  Thereafter, Wray became aware that African-American officers had concerns about the GPD.  Ex. 9, p. 29.  Wray met with Plaintiff Graves in July 2005 and asked him to gather the specific concerns.  Ex. 10 at 61-72.  Subsequently, African-American officers, including many Plaintiffs, met to discuss their concerns with the understanding that they would be presented to Wray.  *Id.* at 61-72.  On 26 August 2005, Plaintiffs Graves, Hunter, and Wallace met with Wray, the City Manager, and the City Attorney and presented the concerns.  *Id.* at 61, 82-92; Ex. 11 at 116-119.

In response to these concerns, investigations were conducted into the alleged issues.  Wray's command staff reviewed discipline determinations.  Ex 10 at 92-93; Ex. 13 at 101-04.  Separately, the City Legal Department began a review of the GPD and the African-American officers' concerns.  Ex. 13 at 101-04; *see also* Ex. 14. In November 2005, the City Manager engaged an outside law enforcement consulting agency, Risk Management Associates ("RMA") to supplement the efforts of City Legal in reviewing alleged issues within the GPD.  (Am. Complt. ¶¶ 96-98.) *See also* Ex. 13 at 101-04.[3]

## QUESTIONS PRESENTED

I.    IS THE CITY ENTITLED TO SUMMARY JUDGMENT WHEN PLAINTIFFS CANNOT SATISFY THE ELEMENTS OF AN ACTIONABLE HOSTILE WORK ENVIRONMENT CLAIM?

II.   IS THE CITY ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS BASED ON THE *FARAGHER/ELLERTH* AFFIRMATIVE DEFENSE?

---

[3] The City defers discussion of additional specific facts and allegations until the argument section of this brief and the addendums for each individual Plaintiff.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issue of material fact remains. When the non-moving party has the burden of proof, the moving party is entitled to summary judgment if it shows the absence of material disputed facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 325 (1986). "As the Supreme Court has made clear, courts should [not] treat discrimination differently from other ultimate questions of fact. Under this rubric, summary judgment is appropriate when there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294-95 (4th Cir. 2010) (internal quotations and citations omitted).

## ARGUMENT AND CITATIONS OF AUTHORITY

### I. PLAINTIFFS CANNOT SATISFY THE ELEMENTS OF AN ACTIONABLE HOSTILE WORK ENVIRONMENT CLAIM.

To establish a racially hostile work environment, a plaintiff must show conduct attributable to the employer that is unwelcome, based on race, and "sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive atmosphere." *Causey v. Balog*, 162 F.3d 795 (4th Cir. 1998). To determine whether alleged harassment constitutes a hostile work environment, the court looks to "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating or a mere offensive utterance; and (4) whether it unreasonably

5

interferes with [the] employee's work performance." *Smith v. First Union Nat. Bank,* 202 F.3d 234, 242 (4th Cir.2000). This inquiry must "focus on [the individual Plaintiff's] personal experience," not the purported treatment of others. *Id.* Each plaintiff must *separately* prove conduct that creates an objectively hostile or abusive work environment, and the plaintiff must also perceive his or her unique environment to be abusive. *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 183 (4th Cir. 1998).

The record does not support a finding that any alleged harassment was "based on race" or was both objectively and subjectively "severe or pervasive" to any individual Plaintiff. In fact, the most damaging evidence comes from Plaintiffs' own testimony. A Title VII plaintiff who admits facts contrary to the elements of his claim "has pleaded himself right out of court." *Lightner v. City of Wilmington*, 545 F.3d 260, 264-65 (4th Cir. 2008). That is exactly what Plaintiffs have done in many instances in this case.

### A. Plaintiffs Cannot Show That Alleged Harassment Was Based on Race.

"A plaintiff who fails to demonstrate conduct that was 'related to his race, or that his workplace was permeated with racially discriminatory behavior' will have summary judgment granted against him." *Bittle v. Elec. Ry. Imp. Co.*, 576 F. Supp. 2d 744, 757 (M.D.N.C. 2008)(internal quotation omitted). While Plaintiffs have made numerous allegations throughout this litigation that Wray, Brady, Sanders and others[4] created their

---

[4] In an example of how strained Plaintiffs' hostile work environment claims really are, Plaintiff Pryor testified that the hostile work environment was created, at least in part, by Plaintiff Phifer. Ex. 15 at 29 ("Q. So if Captain Phifer did not have an investigation conducted, he, then, contributed to the hostile work environment, correct? A. In part. You know, yes, I would say yes, in part.") Such testimony undercuts attempts by

6

hostile work environment, there is insufficient evidence in the record that supports a finding that the alleged harassment of any Plaintiff was based on his or her race.

    1.  *The Alleged Hostile Work Environment Preceded Chief Wray.*

Plaintiffs' Amended Complaint asserts that the hostile work environment in the GPD *began* with the hiring of David Wray as Chief of Police. (Am. Complt. ¶ 114.) Yet, much of what Plaintiffs contend created the hostile work environment actually preceded Wray's tenure as Chief.[5] By way of example, Brodie testified that there was a hostile work environment in the GPD from the time he began his employment in 1984, including during the tenure of multiple African-American Chiefs. Ex. 16 at 24-25. Wall testified that there was a hostile work environment in the GPD as early as 1981. Ex. 17 at 34. Graves testified that he had conversations with other African-American officers that pre-dated Wray's tenure as Chief about unfair treatment of African-American officers. Ex. 10 at 36-38. Little said that African-Americans had been treated unfairly the entire time he was with the GPD, including well before Wray took office. Ex. 18 at 42-43.

Similarly, many Plaintiffs complain about inequities "under Wray" with respect to off-duty work assignments at the Greensboro Coliseum. However, those issues actually came to a head in 2002, when Robert White was Chief, and at that time an appropriate system was put in place to address those complaints and remained in place while Wray was Chief. *See* Ex. 19 at 86-87; Ex 12.

---

Plaintiffs to assert a "blanket" environment that was hostile to all African-Americans—if such were the case, then Phifer created his own hostile work environment.

[5] Some of these incidents are included in the addendums, where space permitted. However, as the relevant time period for the hostile work environment is July 2003 through 12 January 2006, the City focused on that period.

7

This evidence suggests that to the extent Plaintiffs believed there was an uncomfortable environment for African-Americans in the GPD, such environment allegedly had existed long before the hiring of Wray as Chief, including during the tenure of the two African-American chiefs who preceded Wray.  However, perhaps for optical reasons, Plaintiffs have sought to frame this lawsuit as being strictly about the white Chief and his administration, even when that is contradicted by their own testimony.  This is a flawed approach to an employment discrimination claim.  As the Fourth Circuit has stated, "Law does not blindly ascribe to race all personal conflicts between individuals of different races. To do so would turn the workplace into a litigious cauldron of racial suspicion. Instead, legally sufficient evidence is required to [support] an actionable claim of discrimination." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 282 (4th Cir. 2000).  Plaintiffs do not have legally sufficient evidence to show that Wray or his administration created a hostile work environment *based on race.*

### 2.  *Wray's Leadership Style Posed Problems for Officers of All Races.*

Rather, the picture of Wray painted by the testimony in this case is that he had a management style focused around surrounding himself with "yes men" and that he didn't like those who challenged his decisions.  For example, Hunter testified that Wray had personal animosity towards him, not because of Hunter's race, but because Hunter had questioned Wray's authority and Wray was "vindictive."  Ex. 11 at 52-55, 110-11.  Graves also testified that Wray was "vindictive" and did not look favorably on anyone who questioned his authority.  Ex. 10 at 13-14.  Brodie testified that his only complaint about Chief Wray's tenure was that the department had an environment of "rule by fear."

8

Ex. 16 at 79-80. This "fear" applied to all officers of all races. *Id.* at 80-81.

Plaintiff James, Wray's Executive Assistant, testified that it was not just African-American officers who disliked the environment in the GPD while Wray was Chief, but rather that officers of all races, genders, and ranks had issues and concerns about the organization during that time period. Ex. 20 at 119-20. James also testified that not all African-American officers had issues with Wray. *Id.* Plaintiff Phifer, a Captain, testified that Wray was not fair to people as a whole, and often selected certain officers for certain positions because he knew they would not question his authority. Ex. 21 at 185-86. Phifer pointed to Annie Stevenson, an African-American that Wray promoted to his command staff, but who Phifer did not believe was qualified. *Id.* Phifer also gave examples of how Wray put two officers, one black and one white, through the same type of "trauma" by authorizing investigations of these officers. *Id.* at 187. Finally, Plaintiff Rogers, a Captain at the relevant time, testified that Wray had "vendettas" against anyone who challenged him, regardless of race. Ex. 22 at 213-14. Rogers gave examples of Wray's "vendettas" against white commanding officers. *Id.* Thus, it is clear from the facts and Plaintiffs' own testimony that Wray's leadership style caused problems across all races. *See Norris v. City of Anderson*, 125 F. Supp. 2d 759, 768 (D.S.C. 2000) (holding that supervisors who acted in a self-serving manner did so to African-American and Caucasian officers, so those actions "must logically be based on factors other than race and cannot be used to support a claim for a racially hostile work environment").

The inference that any problems created within the GPD by Wray's management style were *not based on race* is further supported by testimony from other high-ranking

9

GPD officers during Wray's tenure as Chief. Dwight Crotts, the Captain over SID and Professional Standards while Wray was Chief, and Craig McMinn, the Sergeant over SID during the majority of the time period at issue in this case, were both highly critical of Wray's management style, decision-making, and certain specific actions. Ex. 2 at 170-73, 203-04, 211-12; Ex. 7 at 41-42, 69-70. However, both of these officers unequivocally stated that they did not believe that any of Wray's decisions of which they were critical-decisions also criticized by Plaintiffs-were racially motivated. Ex. 2 at 236; Ex. 7 at 95.

    3. *Wray's "Inner Circle" Is Not Evidence of Racial Motive.*

Plaintiffs also repeatedly make reference to Wray excluding Tim Bellamy and Annie Stevenson, two African-American members of his command staff, from certain meetings. However, Bellamy himself acknowledged that Bill Stafford, a white Assistant Chief who had been promoted to Assistant Chief by former Chief White and who vied with Wray for the vacant Chief position, was also excluded from meetings of Wray's "inner circle." Ex. 24 at 16-17. Bellamy further testified that Captain Hastings, who was white, was excluded from meetings by Wray as well. *Id.* at pp. 329-30. Rogers, who was another Captain while Wray was Chief, testified that Wray's inclusion of certain individuals in his "inner circle" (and exclusion of other individuals), was *not based on race*. Rather, Rogers believes Wray and his "inner circle" felt that they were smarter than everybody else and did not need the input of others. Ex. 22 at 182.

Similarly, while Crotts was critical of Wray as Chief, he saw nothing wrong with Wray's "inner circle." He testified that "every chief surrounds himself with folks that they're comfortable with and I think this is the group of individuals he was comfortable

with getting his information…giving advice, counsel, bouncing around ideas." Ex. 2 at 176. While Plaintiffs portray Wray as having regular command staff meetings that excluded African-Americans, the facts are that these meetings of Wray's "inner circle" took place after regular business hours (Ex. 23 at 115-117) and were not "regular command staff meetings." Ex. 2 at 238. Meetings of people with whom Wray was friends or felt comfortable do not support Plaintiffs' allegations of a racially hostile work environment. *See Morris-Belcher v. Hous. Auth. of City of Winston-Salem*, 2005 WL 1423592 (M.D.N.C. June 17, 2005)("The law is clear that giving preferential treatment to friends or social acquaintances does not violate Title VII."); *see also Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000)("[a]n employer is not required to like his employees."). Moreover, there is no evidence that any *Plaintiff* was excluded from any meeting in which he or she should have, by rank, been included.

4. *Allegations that SID Targeted African-American Officers are False.*

Plaintiffs also seek to support their claims with allegations that Officer Sanders and SID investigated only African-American officers. These allegations are simply not borne out by the facts. In truth, Officer Sanders investigated the exact same number of white officers as black officers while in Special Intelligence. Ex. 6 at 35-36, 92-93. Furthermore, while Plaintiffs ascribe nefarious motives to Officer Sanders' investigations of African-American officers, the facts reveal that Sanders' investigations of many of these officers actually *cleared the officers of any criminal wrongdoing*. Specifically, Sanders' investigations determined that Plaintiffs Lawrence Alexander and Brian James had not committed any criminal acts and his investigation of Officer Fulmore resulted in

11

the same determination.   Ex. 6 at 682-8; Ex. 8 at 33-34; Ex. 25 at 97-98; Ex. 20 at 56-57.

Sanders' conclusions and conduct was consistent in investigations of officers of all races.

Furthermore, SID and the Criminal Investigations Division ("CID") both performed investigations of officers of both races.   Ex. 23 at 187-188.   In fact, just as Sanders investigated a similar number of African-American and white officers while in SID, a similar number of Plaintiffs were investigated by CID (Cherry, Chandler, Davis) as were by SID (Alexander, James, Ricketts, Morton, Snipes).[6] Ex. 26 at 191-192; Ex. 27 at 193-95; Ex. 28 at 221-222.

5.   *Plaintiffs' Perceptions are not Supported by Facts.*

Finally, testimony from certain Plaintiffs demonstrates that there was a tendency among African-American officers to ascribe racial motives to essentially *all* activities, even when there was no basis to do so.   For example, Plaintiff Davis testified "as a … African-American officer, you always think that you're not treated fairly or equally."   Ex. 28 at 179.   Plaintiff Snipes testified that "any investigation that involve black officers involve me as well."   Ex. 29 at 136.   While Plaintiffs may hold these beliefs, they are not supported by actual facts from which a jury could conclude that activities in the GPD during the relevant time period were based on race.

For all the reasons above, Plaintiffs cannot show alleged harassment *based on race*, and the City therefore is entitled to summary judgment on Plaintiffs' claims.

**B.  Plaintiffs Cannot Show "Severe or Pervasive" Racial Harassment.**

To survive summary judgment, each Plaintiff must forecast evidence that the

---

[6] Other Plaintiffs were included in photo arrays, but were not the focus of investigations.

Case 1:09-cv-00934-TDS-JEP   Document 105   Filed 08/15/13   Page 14 of 44

events in question were "sufficiently severe or pervasive to alter his conditions of employment and create an abusive atmosphere." *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 190 (4th Cir. 2004) (quoting *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-84 (4th Cir. 2001)). "To be actionable, the conduct must create an objectively hostile or abusive work environment, and the complainant must also [subjectively] perceive the environment to be abusive." *Id.* This is "a high bar" that each Plaintiff must clear. *EEOC v. Central Wholesalers, Inc.*, 573 F.3d 167, 176 (4th Cir. 2009) (internal quotation omitted). He or she "must show that the environment was pervaded with discriminatory conduct 'aimed to humiliate, ridicule, or intimidate,' thereby creating an abusive atmosphere." *Id.* Plaintiffs cannot forecast sufficient evidence of alleged harassment in the GPD that is both objectively and subjectively "severe or pervasive."

      1. *"Severe or Pervasive" Harassment.*

Only egregious and frequent conduct rises to the level of an actionable hostile work environment. In *Spriggs*, the employee's supervisor used "incessant racial slurs, insults, and epithets." 242 F.3d at 183. He had a "routine of talking about [the plaintiff's] wife in racially derogatory terms." *Id.* He "placed a picture of a monkey between the pages of a manual … that [the plaintiff] regularly used … along with the notation 'so you'll never forget who you are.'" *Id.* The comments were "frequent and highly repugnant," and caused the plaintiff to complain and be "outraged." *Id.* at 185-86. Management did not then respond adequately. *Id.* at 188-89; *see also White v. BFI Waste Servs, LLC*, 375 F.3d 288, 297-300 (2004); *Central Wholesalers*, 573 F.3d at 170-73; *Amirmokri v. Baltimore Gas and Elec. Co.*, 60 F.3d 1126, 1131 (4th Cir. 1995).

13

By contrast, conduct that is less frequent, less odious, not directed to the plaintiff, and not the subject of regular complaint, has not been found to be "severe or pervasive" at summary judgment. *See, e.g.*, *Hartsell v. Duplex Prod., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997) ("Title VII does not guarantee a happy workplace," nor was it "designed to create a federal remedy for all offensive language and conduct in the workplace."). In *Honor*, the plaintiff alleged that a co-worker was "biased against African-Americans and sought to undermine the careers of other African-Americans." 383 F.3d at 190. He alleged a "general culture … that tolerates discrimination, contains a glass ceiling for African-Americans and refuses to implement change." *Id.* However, there was "no evidence in the record … that [the co-worker] or anyone else directed any racially-offensive conduct at [the plaintiff] himself." *Id.* The court did not give weight to evidence of the treatment of *other* employees. *Id.* The court concluded that the claims were "based on professional frustrations, not personal racist attacks." *Id.*

In *Belton v. City of Charlotte*, 175 Fed. App'x 641 (4th Cir. 2006), the plaintiffs alleged failures to promote, the occasional use of a racial slur, discipline incidents that would have been overlooked had they been white, refusals to communicate, and anger and uses of profanity by supervisors. *Id.* at 645-48, 656-58. However, they regularly received appropriate evaluations and had training and other opportunities. *Id.* at 645-48. The incidents were "temporally remote from each other," some "cannot be characterized as based on race," and remarks "were not said in [a plaintiff's] presence." *Id.* at 656. Although the use of epithets was "reprehensible and inexcusable," it was also "isolated" and "remote in time." *Id.* at 656-57; *see also Williams v. Aluminum Co. of Amer.*, 457 F.

14

Supp. 2d 596, 601-05, 608-10 (M.D.N.C. 2006) (finding that events were isolated, the plaintiff did not complain, and when others complained, the company took action)[7].

*Norris* addressed hostile work environment allegations in a law enforcement setting. The plaintiff heard about racial comments, but did not complain. 125 F. Supp. 2d at 762-63. He also heard rumors. *Id.* A racial slur was made over the radio, but "was not directed at [the plaintiff] and was not made in his presence." *Id.* He contended that the department "do[esn't] investigate stuff involving minorities like they should." *Id.* at 764. In fact, when issues were raised, the city investigated. *Id.* He complained of "a ['black face'] fake i.d. card which he considered racist" found in a file cabinet, "but there was no indication that the card had been shown to any employee, including [the plaintiff]." *Id.* at 767. He "presented no evidence that he or anyone else even had knowledge prior to the filing of this lawsuit of the existence of the card," and "[e]vents of which [the plaintiff] had no knowledge cannot support a hostile work environment claim, because a person cannot perceive an act as hostile if he is not aware of its existence." *Id.* at 768-69. No incidents were physically threatening or humiliating, or "involved a direct confrontation." *Id.* at 767, 769. Furthermore, "most of the events … were not directed at [him] personally," nor did they all "involve agents of [the defendant]." *Id.* at 179. Finally, the plaintiff "failed to report almost all of the alleged incidents," and continued to

---

[7] Because *Williams*, like this case, involved dozens of Plaintiffs who each had to prove an individualized hostile work environment, Judge Tilley held a series of summary judgment hearings at which the parties would argue the merits of Defendant's Motion for Summary Judgment as to each Plaintiff and point to evidence in the record that would support or oppose that Plaintiff's claims. *Williams*, 457 F. Supp. 2d at 601. The City respectfully suggests that a similar approach to summary judgment hearings would be appropriate here.

15

work despite his claims of a hostile work environment. *Id.* at 771. The court noted that "Title VII is not a federal guarantee of refinement and sophistication in the workplace." *Id.* at 765 (internal citations omitted). Its standards "are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Id.* at 766 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

2. *The Alleged Harassment was not Objectively Severe or Pervasive.*

a. Use of Photos Was Objectively Reasonable and Insufficient Evidence of Severe or Pervasive Racial Harassment.

A major focus of Plaintiffs' claims is that, at the direction of Wray and Brady, Sanders used lineup books composed solely of photos of black GPD officers for the "purpose of framing, embarrassing, and wrongfully investigating and charging black officers with crimes, offenses and violations of both law and police policies." (Am. Complt. ¶¶ 48-49.) There is no evidence that such a lineup book ever existed.[8] The basis for Plaintiffs' allegations are rumors spread among African-American police officers in the Summer of 2005—rumors devoid of factual support and which cannot support a hostile work environment claim. *See* Sec. I.B.5, *infra*.

Almost all record evidence of lineup books and/or other photographs which

---

[8] The only testimony resembling this allegation came from Rick Ball, who said that he believed there was a notebook in the IA office in the early 1990s that contained photos all of the black officers in the Department and a notebook that contained all of the white officers. Ex. 5 at 118. However, no other witness has corroborated Ball's recollection; to the contrary, other officers who would be in a position to have knowledge of such a notebook, including Plaintiff Phifer, testified that while there were notebooks of GPD employee photographs in IA, these notebooks contained photos of all GPD employees and were arranged in alphabetical order, not separated in any manner by race. Ex. 21 at 144-45; Ex. 23 at 200-01; Ex. 49, Affidavit of Dannie Thacker; Ex. 50, Affidavit of Dennis Wyrick; Ex. 51, Affidavit of Jane Allen.

include African-American GPD officers came from the testimony and files of Sanders. Sanders used two lineups for legitimate investigations, and tape recorded investigative interviews in which he used a line-up or a photo. The actual *facts* with regard to the use of lineup books and photographs during Sanders' investigations are as follows: (1) Sanders used two photo array lineups, one which includes 19 black officers for an investigation of a sexual assault, the other which includes six black officers for an investigation of an assault; (2) Sanders also showed photographs of four officers, A.J. Blake and Plaintiffs Graves, Snipes and Rankin, during legitimate investigations; and (3) on one occasion, Sanders showed a witness digital photographs of every GPD employee.

**Sexual Assault Investigation Photo Lineup**:  In January 2005, Sanders was notified by another detective that a female prostitute had alleged that an African-American, uniformed GPD police officer had sexually assaulted her in a motel room. Ex. 6 at 210.  Sanders and his Sergeant, Tom Fox, interviewed the complainant.  She described the assailant as short and dark skinned.  Ex. 30 at GSO X 014290.  She also said a white uniformed GPD officer was with the black officer; however, the alleged assault took place in the closed bathroom and the complainant said she could not identify the white officer.  Ex. 6 at 58; Ex. 30 at GSO X 014292.

The complainant told Sanders and Fox that the assault occurred several months earlier at a motel.  Ex. 6 at 526; Ex. 30 at GSO X 014289.  Sanders went to the motel and found that the complainant had stayed there over a period of time in August and September 2004.  In order to identify the alleged attacker, Sanders decided to use a photo lineup consisting of black uniformed GPD officers who were on duty during the time

17

frame when the complainant was at the motel. Sanders determined that 19 uniformed black officers were on duty during the relevant time period. Ex. 6 at 466; Ex. 31 at 3.[9]

Thirteen Plaintiffs are among the 19 officers in this lineup. Ex. 32 at 5.[10] The lineup had 19 pages; each included one black GPD officer and five fillers on a single page. Ex. 33.[11] Sanders and Fox showed the lineups to the complainant and she did not identify anyone. Sanders testified that this is the only time these lineups were shown, and the City is not aware of any evidence to the contrary. Ex. 6 at 672.

Later, Sanders determined that one of the 19 officers identified by the CAD report, Blake, had answered a call near the motel during the relevant time frame corresponding with specific details given by the complainant. Based on this, Sanders showed the complainant a single photo of Blake. The complainant said that Blake may have been the one, but she was not sure. Ex. 6 at 519. Blake was never charged or disciplined.

Plaintiffs contend that Sanders' failure to show the complainant a photograph of white officers indicates that the investigation was racially discriminatory. However, it is undisputed that the complainant stated she could not identify the white officer and so Sanders did not create a line-up of white officers. Ex. 6 at 58.

It is also undisputed that only 13 of the Plaintiffs were included in these line-ups, meaning that the remaining 22 Plaintiffs were not in these line-ups. Of the 13 Plaintiffs

---

[9] The names of the officers were identified through a computer aided dispatch ("CAD") system, which documents when officers are on duty. The CAD reports were in the case file for Sanders' investigation of this alleged sexual assault. Ex. 31 at 3.

[10] This Response was served in Case No. 09-CV-293. Alston, Blake, Patterson, and D. Stevenson are Plaintiffs in that case but not in this case.

[11] Exhibit 33 is the 19 pages of photos. They are in black and white. Sanders also had a color version of each page in the case file.

18

that appeared in the lineups, their photos were shown to the complainant one time and one time only. Such an isolated incident cannot form the basis of a hostile work environment claim. *Faragher*, 524 U.S. at 788 (holding that isolated incidents that are not extremely serious cannot not amount to discriminatory changes in the terms and conditions of employment.)[12]

**Bachelor Party Assault Investigation Photo Lineup:** In late 2002, Sanders assisted in an investigation in which it was learned that several years earlier, there had been a bachelor party attended by GPD officers at which a GPD officer was alleged to have physically assaulted a woman. Ex. 6 at 407. The first report Sanders received was that primarily African-American officers were at the party, but there was a vague description of a white male there also. *Id.* at 381. In an attempt to identify the party attendees so that they could be questioned about the alleged assault, Sanders showed six six-person line-ups to one of the dancers at the party.[13] Each six-person line-up had one African-American police officer. *Id.* at 388. Of the six officers in these line-ups, Plaintiffs Rankin, Snipes, and Wallace are included.[14] *See* Ex. 34. Only Rankin knew

---

[12] Furthermore, there is no evidence to support a finding that any Plaintiffs' photo was included for a racially discriminatory motive. Multiple Plaintiffs testified that if an officer is trying to identify an individual of a certain race through use of a photo lineup, only photos of individuals of that same race should be included in those line-ups. *See, e.g.,* Ex. 19 at 22-23; Ex. 10 at 22-23.

[13] The lineups were shown to the dancer prior to the time that Wray became Chief, and thus not within the time period that is relevant to the hostile work environment alleged by Plaintiffs in this case. Ex. 6 at 283-84**;** Ex. 35 at 3.

[14] Sanders testified that Snipes was included because he fit the description of an attendee given to him by one of the dancers; Wallace was included because Sanders knew that Wallace had been to another bachelor party with strippers, and that Wallace was actively involved with the strippers at that other party; and Rankin was included as a filler. Ex. 6

19

that his picture was included in the line-up at or about the time it was shown.  (The dancer was Rankin's sister-in-law and told him that Sanders had shown her his picture.)  Ex. 38 at 51, 79.  Rankin confronted Sanders but later apologized.  *Id.* at 82-84.  This isolated incident does not rise to the level of "severe or pervasive" such that it could create a hostile work environment for Rankin.  *Faragher*, 524 U.S. at 788 (1998).

After the six-person lineups were shown, Sanders learned that a witness might be able to identify a white GPD officer at the party.  Ex. 6 at 256, 381-82.  To ascertain the identity of this white officer, Sanders asked for and received digital photos of all GPD employees.  These photos were transferred to Sanders' laptop computer, and Sanders showed these photos, arranged in alphabetical order, to the dancer at her attorney's office.  Ex. 6 at 254-56.  In light of this set of facts, any allegation that Sanders was targeting only African-American officers in this investigation is unsupported by the actual facts.

**Other Photographs Used in Investigations by Sanders:**    In addition to the two line-ups, Sanders showed Blake's photo to the sexual assault complainant, as discussed earlier.  He also showed Graves' photo in an investigation of an illegal nightclub.  Ex. 6 at 672-674.  A firefighter providing security for the nightclub told Sanders that Graves had arrested someone outside the club.  *Id.*  Graves' photo was shown to the firefighter to verify Graves' identity; nothing else involving Graves was ever done.  *Id.*  Sanders showed Snipes' photograph to the aforementioned sexual assault complainant (months prior to her allegation that she was sexually assaulted) when she

---

at 645-46, 676.  Fillers are used as a check-and-balance to ensure the truthfulness of the complainant/witness that is being shown the line-ups.  Ex. 6 at 409.

was interviewed in an investigation of Fulmore in which Fulmore had rented a hotel room in which drug paraphernalia was discovered. Ex. 6 at 677-678. The woman volunteered that she knew Snipes and his photo was shown to verify his identity; nothing more was done. *Id.* Finally, Snipes' and Rankin's photographs were shown to an informant during a drug investigation with the DEA.[15] Ex. 6 at 680.

As with the line-ups, these photos were shown as part of legitimate investigations, not with any racially discriminatory motive, and were isolated incidents that do not rise to the level of "severe or pervasive." *Faragher*, 524 U.S. at 788 (1998). Furthermore, Graves, Rankin, and Snipes were not aware until much later, in some cases after the start of this litigation, that their photos were shown. Therefore the showing of their photos could not have created a hostile work environment. *See* Section I.B.3.A, *infra.*

        b.  SID Conducting Officer Investigations Was Objectively Reasonable.

Plaintiffs place substantial emphasis on the fact that officers in Special Intelligence were conducting investigations of suspected criminal activity of other officers while Wray was Chief. Such investigations, according to Plaintiffs, were allegedly against the Standard Operating Procedures ("SOP") and Departmental Directives of the Greensboro Police Department. (Am. Complt. ¶¶ 78-80.)

While Plaintiffs suggest that the use of Special Intelligence to investigate officers

---

[15] Sanders testified that Snipes' photo was not intentionally shown. Snipes photo was in Sanders' briefcase as part of the bachelor party assault investigation, and the informant accidently saw the photo and said he recognized Snipes' photo. Rankin's photo was shown because as part of the DEA investigation it was discovered that Rankin's phone number was in a suspect's phone records. Sanders simply showed the photo to see if the informant recognized Rankin; he did not, and nothing more was done. Ex. 6 at 485-88.

Case 1:09-cv-00934-TDS-JEP   Document 105   Filed 08/15/13   Page 23 of 44

during Wray's tenure was inappropriate under the SOP for Special Intelligence, this implication is belied by the wording of the SOP. Ex. 52; Ex. 47 at 245-48; Ex. 2 at 232-33. It is also belied by past practice; Special Intelligence officers had been investigating allegations of misconduct by GPD officers well before Wray became Chief. Phifer, who was a Sergeant in IA under Wray's predecessors, testified that during that time period Special Intelligence was sometimes used to investigate criminal allegations against officers. Ex. 21 at 173-74. Additionally, Rick Ball, a Lieutenant and Captain from 1995-2005, testified that under the two Chiefs who preceded Wray, the referral of investigations of officers to Special Intelligence was a "consistent practice" and happened "quite frequently." Ex. 5 at 7, 121-122.

Furthermore, Plaintiff Cuthbertson, a member of Special Intelligence while Wray was Chief, testified that regardless of SOPs or directives, the Chief had authority to refer investigations of officers to Special Intelligence if the Chief felt that that was the appropriate unit to investigate the allegations. Ex. 37 at 54-55. Phifer also testified that there was nothing in the departmental directives that prevented the Chief from assigning Special Intelligence to an officer investigation. Ex. 21 at 67-68.

Finally, any contention that the use of Special Intelligence officers to investigate other officers was against directives and created a hostile work environment is eviscerated by the fact that two Plaintiffs, Rankin and Cuthbertson, were in Special Intelligence and themselves conducted an investigation of Steve Snipes, their fellow Plaintiff. Ex. 37 at 77-78. Rankin also investigated James Hinson. Ex. 38 at 60. Both Plaintiffs testified that their investigation of other officers while in Special Intelligence

22

was *not in violation* of any directives.  Ex. 38 at 62, 150-51; Ex. 37 at 77-78.  Plaintiffs thus allege that when white officers in Special Intelligence investigated other officers, that was against policy and created a hostile work environment.  Yet, when Plaintiffs who were in Special Intelligence investigated officers, that was not against policy and did not create a hostile work environment.  Plaintiffs cannot have it both ways.[16]

> c.  Investigations of Hinson, Fulmore, Morton, Davis and ███ Were Objectively Reasonable.

In their pleadings, discovery responses, and testimony, Plaintiffs focus on investigations of James Hinson, Julius Fulmore, Plaintiff Morton, Plaintiff Davis, and Brian Pilcher as incidents of racial harassment supporting their hostile work environment claim.  This Court has acknowledged, however, that the impact of "second-hand harassment" is "obviously not as great as the impact of harassment directed at the plaintiff."  *Hayes v. Lowe's Food Stores, Inc.*, 2005 WL 1258932 (M.D.N.C. May 26, 2005)(internal quotation omitted).  Thus, these allegedly harassing incidents should be given less weight in the Court's analysis as to the objectively "severe or pervasive" element of Plaintiffs' claims.[17]  Regardless, as shown below, the actual facts surrounding the investigations of these officers demonstrate that the investigations were reasonable, not race-based, and cannot support Plaintiffs' individual claims against the City.

**Hinson**:  Plaintiffs allege that Sanders' investigation into the alleged assault at

---

[16] And, of course, if Plaintiffs continue to press the theory that the investigation of other officers by Special Intelligence officers created a hostile work environment, then Plaintiffs Rankin and Cuthbertson are liable for their own hostile work environment.

[17] Obviously this does not apply to the individual claims of Plaintiffs Morton and Davis with respect to their own investigations.

23

James Hinson's bachelor party is evidence that Sanders "targeted" black officers. (Am. Complt. ¶ 83.) This is false. As set forth above in Sec. I.B.2.a, Sanders' investigation led him to search for both white and black officers who may have been witnesses to the alleged assault. Beyond that, Sanders conducted this investigation in or around February of 2003, prior to the time that Wray became Chief and thus prior to the relevant time period alleged by Plaintiffs. Ex. 6 at 593-94; Ex. 1 at 223. Furthermore, to the extent Plaintiffs ascribe some nefarious motive to Sanders investigating an alleged assault that occurred years prior, Plaintiff Cherry confirmed that GPD has an obligation to investigate an allegation of officer misconduct no matter *when* it occurred.[18]

**Fulmore**: To the extent Plaintiffs seek to rely on "second-hand harassment" in the form of the investigation of Fulmore, the relevant facts of that investigation are as follows: In October 2002, nine months before Wray became Chief, the United States Secret Service presented information about a connection between a woman named Pamela Williams and a GPD officer. Ex. 6 at 137-38. In the course of this investigation, allegations surfaced that Fulmore was improperly helping Williams request substantial assistance. *Id.* at 393-94, 397-99. Williams then made additional allegations against Fulmore that came to the attention of the Sheriff, GPD, and the SBI. *Id.* at 653-55. The Sheriff began an investigation, and Sanders was assigned to follow it. *Id.* at 657. The Sheriff requested that a tracker be placed on Fulmore's City-issued vehicle, and the GPD complied with this request. Ex. 6 at 555, 656; Ex. 23 at 18-19. Fulmore himself

---

[18] "Q: So there's no time limit for investigating an issue of misconduct of an officer? A: What I'm saying is, if – exactly. If you find out – if I find out today that two years ago, an officer cursed you out, I still have to investigate it." Ex. 26 at 142.

24

conceded that such action was entirely permissible. Ex. 46 at 8-9. To the extent Plaintiffs assert that Sanders or any GPD officer attempted to sell Fulmore stolen goods, such an allegation is not borne out by the evidence in this case. The only evidence of anything similar is that, during the Sheriff's investigation of Fulmore, that agency expressed an interest in a controlled scenario involving a "stolen" motor, Ex. 6 at 656; Ex. 23 at 18-19. It is not clear whether *the Sheriff's plan* went forward.

**Morton**: Plaintiff Morton was investigated for use of force. Ex. 39 at 70. He was placed on leave with pay during the investigation. *Id.* at 71. The recommended administrative discipline for Morton was termination. *Id.* at 72-73. Morton chose to plead not guilty to the administrative violation and go before a board of inquiry. *Id.* at 73. Thereafter, he was suspended without pay and had a hearing before the board. *Id.* He was told that the board recommended that he not be terminated, but that Wray did not accept that recommendation. *Id.* at 77. Morton appealed his termination to the City Manager, who reinstated him but recommended alternative discipline, including a demotion to Police Officer I, reduction in pay, and suspension without pay for the time already served. *Id.* at 77-78. The GPD accepted the City Manager's disciplinary recommendations, which Morton also accepted, although he could have again appealed the discipline. *Id.* at 162-64. He returned to work immediately and testified that he "didn't care about the discipline as long as it wasn't termination," and that he "really wasn't worried about the discipline." *Id.* at 167. Morton was also charged with simple assault stemming from this incident. *Id.* at 72. He was found not guilty. *Id.* at 77. The District Attorney made the decision to prosecute Morton. Ex. 4 at 40-42.

25

**Davis**: Plaintiff Davis was administratively investigated for use of force and received a first-level reprimand. Ex. 28 at 104-05. He acknowledged that he told another officer that he had used a choke maneuver on a handcuffed suspect. *Id.* at 110-12. Later, the District Attorney received a letter regarding the use of force incident. *See* Ex. 40. The District Attorney made the decision to pursue a criminal investigation. Ex. 28 at 195. Davis agreed that the District Attorney's conduct after receiving the letter was not discriminatory. *Id.* at 114. The conclusion of the criminal investigation was that there was no probable cause for criminal charges, and the case was closed. *Id.* at 107; Ex. 41. Davis agreed that the criminal investigation was professional and fair. Ex. 28 at 108.

███████ In an effort to demonstrate a racially hostile work environment, Plaintiffs routinely compare Morton and Davis to Officer ████, also investigated for use of force. Plaintiffs claim ████ was treated differently than Morton and Davis because he was white. However, the evidence shows that, like Morton and Davis, ████ was investigated criminally. Ex. 4 at 40-42. The District Attorney made the decision whether or not to prosecute ████ *Id.* Also, with respect to ████ administrative investigation, Wray, then an Assistant Chief, concurred with a termination recommendation for ████, the same position he took with respect to Morton. Ex. 53.

As is clear from the above, there is nothing about these alleged second-hand harassing incidents that can support Plaintiffs' hostile work environment claims. The investigations were all warranted and objectively reasonable, there is no indication that there was any racially discriminatory motive behind any of the investigations, and in most instances the acts of which Plaintiffs' complain cannot be attributed to the City.

26

d. Plaintiffs' Beliefs that They May Have Been Under Surveillance Are Insufficient Evidence of "Severe or Pervasive" Racial Harassment.

There is no admissible evidence in the record that any Plaintiffs were actually under surveillance at any time by anyone in the GPD.  While Plaintiffs alleged that Sanders monitored their emails, the only example given was Plaintiff Hinson. (Am. Complt. ¶ 101.)  Hinson subsequently disclaimed this allegation.  Ex. 42 at 157-58.

Regardless, even if Plaintiffs had been under surveillance by Sanders, or any other member of the GPD, surveillance is not sufficiently severe so as to interfere with a plaintiff's work performance and therefore cannot objectively create a hostile work environment.  *See Manson v. Gen. Motors Corp.,* 66 F. App'x 28, 32 (7th Cir. 2003)(granting summary judgment to employer on ground that allegations of "unfair job assignments, derogatory remarks, and *covert surveillance of [his] work*" did not rise to the level of a hostile work environment.)(emphasis added); *see also Charlot v. Donley,* 2013 WL 1339614 (D.S.C. Jan. 31, 2013) report and recommendation adopted, 2013 WL 1339594 (D.S.C. Mar. 29, 2013)(holding that plaintiff's allegations of surveillance "do not demonstrate the type of severe and pervasive conduct that alters the terms of her employment."); *Johnson v. Gestamp Alabama, LLC,* 2013 WL 2248150 (N.D. Ala. May 20, 2013); *Collier v. City of Opelika,* 374 F. Supp. 2d 1098 (M.D. Ala. 2004).

3. *The Alleged Harassment was not Subjectively "Severe or Pervasive."*

To the extent any of the allegations of racial harassment by Plaintiffs could be found to be objectively "severe or pervasive," the City is still entitled to summary judgment on Plaintiffs' claims because Plaintiffs cannot satisfy the "subjective" element.

27

a. Acts of which Plaintiffs were not aware cannot create a hostile work environment.

Plaintiffs cannot prove that many of the acts they allege support their hostile work environment claim were subjectively severe and pervasive for one of the most basic of reasons—*they were not even aware of these acts while they were allegedly occurring*.  It is axiomatic that incidents of which a plaintiff is not aware cannot support a hostile work environment claim. Allegedly harrassing "behavior of which a plaintiff is unaware, and thus never experiences, is not 'harassment' of the plaintiff (severe, pervasive, or other). Thus, for alleged incidents of racism to be relevant to showing the severity or pervasiveness of the plaintiff's hostile work environment, the plaintiff must know of them." *Mason v. S. Illinois Univ. at Carbondale*, 233 F.3d 1036, 1046 (7th Cir. 2000); *see also Brooks v. City of San Mateo,* 229 F.3d 917, 924 (9th Cir. 2000)("Harassment directed towards others of which an employee is unaware can, naturally, have no bearing on whether she reasonably considered her working environment abusive."); *Burnett v. Tyco Corp.,* 203 F.3d 980, 981 (6th Cir. 2000) (holding that conduct was irrelevant to hostile work environment claim absent evidence that plaintiff was contemporaneously aware of it); *Johnson v. City of Fort Wayne*, 91 F.3d 922, 938, n. 8 (7th Cir. 1996) (harassing conduct must be directed at employee to show racially hostile environment).

The City is not aware of any evidence that Plaintiffs had any awareness of the details of the investigation of James Hinson during the relevant time period until the publicized discovery of the tracker on his vehicle in June 2005.  Therefore, anything that occurred with respect to Hinson prior to June 2005 could not have subjectively

28

contributed to any Plaintiff's alleged individual hostile work environment. As for Plaintiffs' knowledge of the discovery of the tracker, it is undisputed that that incident set in motion Wray reaching out to Plaintiff Graves to ascertain the concerns of African-American officers, including Plaintiffs, the subsequent meetings of African-American officers in July 2005 to discuss and provide their concerns to Graves, Wallace, and Hunter to bring to the Chief, and the ultimate meeting between Graves, Wallace, and Hunter and Wray, City Manager Johnson, and City Attorney Miles. This final meeting spawned multiple investigations into issues within the GPD, including the concerns of the Plaintiffs. Thus, the publicized discovery of the tracker on Hinson's vehicle did not create a hostile work environment; rather, it was the catalyst for the City to gather Plaintiffs' concerns and appropriately investigate them.

With respect to Sanders' use of photos in investigations, only one plaintiff whose photo was used (Norman Rankin), had any contemporaneous knowledge of the act. There is no admissible evidence that any of the 13 plaintiffs in the sexual assault investigation line-ups knew that their photograph had been shown to the complainant until almost a year after they were shown. Wallace did not know his photo was in the six-person lineup until discovery in this case, Ex. 43 at 89, 136, and Snipes did not know his picture was in this lineup until sometime after Wray's resignation. Ex. 29 at 144. Similarly, there is no evidence that Snipes or Rankin was aware that his photo was shown in the DEA investigation until discovery in this litigation.

b. Plaintiffs Did Not Complain About Their Work Environment.

Perhaps the most telling "evidence" that the work environment for Plaintiffs in the

29

GPD was not "subjectively hostile" is that according to Plaintiffs' own testimony the alleged hostile work environment spanned decades, yet the vast majority of Plaintiffs never lodged any complaints about their work environment until mid-2005 or later.[19] That a plaintiff did not complain about his or her work environment is evidence that the plaintiff did not subjectively perceive the alleged harassment to be hostile or abusive. *See, e.g., Gleason v. Mesirow Fin., Inc.,* 118 F.3d 1134, 1145 (7th Cir. 1997)(rejecting claim of subjective hostile work environment, as the alleged harassment "was not troubling enough to [plaintiff] that she bothered to report it to any of her superiors, even though she was given ample opportunity to do so"); *Zayas v. Caring Cmty. of Connecticut*, 2012 WL 4512760 (D. Conn. Oct. 1, 2012)(holding that alleged incidents of harassment "were not severe as evidenced by the fact that [plaintiff] never complained about them."); *Osorio v. Source Enterprises, Inc.*, 2006 WL 2548425 (S.D.N.Y. Sept. 5, 2006)(holding that the fact that the plaintiff never complained suggests that she did not "subjectively perceive that environment to be abusive."); *King v. The Finish Line,* 997 F. Supp. 987, 994 (N.D. Ill. 1998).

Thus, Plaintiffs' fail the subjective element of an actionable hostile work environment claim because they were either (1) unaware of the alleged racial harassment and it therefore could not have affected them or (2) they were aware of alleged racial harassment but did not deem it sufficiently "severe or pervasive" to make any complaints.

---

[19] And even then the complaints were only brought forward at the request of Wray. Ex. 9, p. 29.

4. *Plaintiffs Cannot Support Their Hostile Work Environment Claims With Allegations of Disparity in Treatment with Respect to "Specialized Schools" and Off-Duty Work Assignment.*

a.  Specialized Schools.

Plaintiffs allege that "Black officers of the Greensboro Police Department were frequently and typically denied opportunities and benefits afforded to other officers." (Am. Complt. ¶ 108.)  The primary example of such "opportunities and benefits" is with respect to attendance at "specialized schools."  *Id.*; *see also* Ex. 9, pp. 4, 33, 44, 58, 67, 70.  The primary "factual" allegations in the Amended Complaint as to these specialized schools relate to the alleged experiences of Plaintiff Evans.   (Am. Complt. ¶ 108.) Plaintiffs allege that Wray agreed to send Evans to a multi-day academy in Salemburg, NC to be a certified firearms instructor, but that Wray supplied Evans only with enough ammunition to get through the first day of the program and refused to pay for his lodging. *Id.*  Plaintiffs allege that Evans had to advance "thousands of dollars for his ammunition and lodging expenses."  *Id.*  Evans himself further alleged that the GPD "gave him no money to eat with," so he had to travel to stay with his parents because "he couldn't afford to eat in the cafeteria."  Ex. 9, p. 27.

Discovery revealed that virtually everything Plaintiffs alleged as to Plaintiff Evans' was *absolutely false*.  Ex. 44 at 104-120.   First, regarding allegations about ammunition and lodging, Evans testified that despite what Plaintiffs alleged in the Amended Complaint, he actually did not have to advance any money for ammunition or lodging—lodging at the academy was free he never had to pay for any ammunition. *Id.* at 110, 113.  Evans said that fellow Plaintiff Brian James delivered additional ammunition

31

to him after the first day of the academy. *Id.* at 106-107. (For his part, Plaintiff James said this never happened. Ex. 20 at 194.) With respect to Evans' allegation about not being able to afford to eat, the facts reveal that Evans failed to review the City travel policy that allowed for him to have advances for meals. Ex. 44 at 107-08. Thus, Evans ate the majority of his meals at his parents' house while he was at the academy. *Id.* at 104-05. Then, despite the fact that he did not actually pay for most of his meals while ate the academy, Evans still submitted for and accepted reimbursement for *all* meals when he returned and was thereby reimbursed *more* than he actually spent. *Id.* at 111-12.

While other Plaintiffs' specific allegations with respect to specialized schools are addressed directly in the attached addendums, the strength of these allegations as a whole are reflected by the strength of the exemplar "facts" they chose to include in their Amended Complaint—"facts" that were completely fictitious. Whatever Plaintiffs may have believed with respect to their opportunities to attend specialized schools, the record evidence is not sufficient to support a jury finding of an objectively hostile work environment on the basis of race.[20]

b. Off-Duty Work Assignments.

Although not in the Amended Complaint, many Plaintiffs allege that disparity in off-duty work assignments for African-American and white officers while Wray was Chief contributed to their hostile work environment. *See, e.g.,* Ex. 9, pp. 14, 18-19, 23, 31, 33, 41, 44, 46, 62, 66, 68, 70-71. These allegations are unsupported by the record

_____

[20] Planitiff Tunstall testified that while Wray was Chief he had no trouble getting approved for specialized training. Ex. 54 at 130-31, 134.

evidence and/or cannot support a finding of an objectively hostile work environment.

Plaintiffs' complaints regarding the assignment of off-duty work are based in large part on their perception of the relative desirability of particular off-duty assignments. According to Plaintiffs, white officers received "less demanding" and "posh" off-duty assignments such as the Greensboro Country Club, Friendly Shopping Center, and the airport. Ex. 9, pp. 19, 23, 33, 66, 71. African-American officers received "less desirable off-duty assignments" like nightclubs and apartment complexes, and the "river walk" near North Carolina A&T, where there was a "high propensity for incidents to occur that require police action." *Id.* at pp. 5, 33, 45, 62, 66, 70-71. Even if these allegations are true, however, they are not sufficient to establish a hostile work environment. "Title VII does not guarantee a happy workplace," *Hartsell*, 123 F.3d at 773, and complaints "based on professional frustrations, not personal racist attacks" will not support a hostile work environment claim. *Honor*, 383 F.3d at 191.

In a case very much on point, the Sixth Circuit evaluated an African-American police officer's claim of hostile work environment that was based, in part, on allegations that his supervisor allegedly falsified statistics in order to grant a white officer preferential job assignments. *Parks v. City of Chattanooga*, 74 F. App'x 432, 441 (6th Cir. 2003). The Court affirmed the District Court's grant of summary judgment, holding that "since [the supervisor's] alleged harassment did not prevent [plaintiff] from performing his duties as a police officer, but only denied him certain work assignments that [plaintiff] would have preferred, his conduct would not cause a reasonable person to believe that his work environment was abusive or hostile." *Id.*

Similarly, District Courts addressing this issue have routinely held that allegations of undesirable assignments are insufficient to sustain a hostile work environment claim. *See, e.g., Sellers v. U.S. Dep't of Def.,* 654 F. Supp. 2d 61 (D.R.I. 2009)(granting summary judgment on hostile work environment claim and rejecting allegations of increased duties and responsibilities as constituting severe and pervasive harassment); *Ford-Fugate v. FedEx Freight*, 2007 WL 79104 (S.D. Ind. Jan. 8, 2007)(granting summary judgment on plaintiff's hostile work environment claim on grounds that plaintiff's allegations, including that she was "excessively monitored, excessively paged at work, *given more difficult assignments than her male co-workers*, and disciplined more than her male co-workers" did not amount to harassment that was severe or pervasive)(emphasis added); *Abouzied v. Saleh Montaser Jr. H.S. No. 78*, 2000 WL 1276635 (E.D.N.Y. Aug. 30, 2000). Thus, Plaintiffs' claims are not supported by their assignment to "less desirable" off-duty work.

Numerous Plaintiffs also complained specifically about alleged racial disparity "under Wray" in off-duty assignments at the Greensboro Coliseum. *See, e.g.*, Ex. 9, pp. 4-5, 28, 33, 41, 65, 68. However, in August 2002, in response to complaints about the fairness of Coliseum assignment, a system was put in place to ensure, as best as possible, equitable distribution of Coliseum events. Ex. 12. The distribution of Coliseum assignments was tracked in a database, and the statistics in the database entries for 2003-2005, when Wray was Chief, do not support Plaintiffs' claims of racial inequity in assignment of off-duty Coliseum work. *Id.* Instead, the statistics patently refute the claims of certain Plaintiffs, such as Calvin Stevens, who claimed to have signed up for 6

34

or 7 events at the Coliseum while Wray was Chief and had not been awarded any of those

job.  Ex. 9, p. 68.  The database reflected, however, and Stevens conceded, that he

actually had not signed up for *any* Coliseum events while Wray was Chief.  Ex. 45 at

111-15.  Thus, to the extent there were any legitimate complaints of inequities in

assignments of off-duty work at the Coliseum, those complaints, and a reasonable

response to the complaints, pre-dated Wray's tenure as Chief, and Plaintiffs' allegations

with respect to assignments during 2003-2005 are not supported by the evidence.

### 5.  *Rumors Cannot Support Plaintiffs' Hostile Work Environment Claims.*

While the specific allegations of allegedly harassing acts differed widely between

individual Plaintiffs, one common thread tying them all together was "rumors."  Virtually

every single Plaintiff testified that he or she heard "rumors" during the time period at

issue in this case—rumors about the "black book," rumors about investigations of other

officers, rumors about surveillance.  And these "rumors" allegedly caused the Plaintiffs'

hostile work environment.  For example, Plaintiff Hinson alleges that the rumors of the

"black book" contributed to his hostile work environment, but his only source of the

rumors was from Plaintiff Graves.  Ex. 42 at 40-41.  By spreading rumors to Plaintiff

Hinson, Plaintiff Graves (who himself testified that he had no firsthand knowledge as to

whether the rumors about the book were based in fact, *see* Ex. 10 at 40-42) was the

individual responsible for creating any uncomfortable work environment for Hinson that

was caused by Hinson's purported concerns regarding the existence of a "black book."

However, "'the mere existence of uncomfortable rumors in the workplace is not

the type of hostile environment' that Title VII was meant to redress." *Hott v. VDO Yazaki*

35

*Corp.*, 1996 WL 650966 (W.D. Va. Nov. 6, 1996) (quoting *McDonnell v. Cisneros,* 1995 WL 110131, *8 (N.D. Ill.1995)).  Allegations of rumors are insufficient to establish a hostile work environment if the rumors do not diminish a plaintiff's ability to work. *Giardina v. Lockheed Martin Corp.*, 2003 WL 21634934 (E.D. La. July 3, 2003); *see also Jackson v. Texas A & M University Syst.,* 975 F. Supp. 943, 948 (S.D. Tex. 1996).

Moreover, Plaintiffs should not be allowed to advance rumor-based hostile work environment claims when they did nothing to ascertain the veracity of the rumors. Worse, they perpetrated the rumors amongst themselves, in essence creating, or at the very least contributing to, their own hostile work environment.  As this Court held in *Morris-Belcher v. Hous. Auth. of City of Winston-Salem*, contentions of a hostile work environment based on rumors "that [plaintiffs] had 'heard' and perhaps helped spread," is not "evidence of discrimination or harassment."  2005 WL 1423592 at *8 (M.D.N.C. June 17, 2005).  This Court has also held that conversations amongst employees about allegedly harassing acts is not an act that is attributable to the employer.  *Hayes v. Lowe's Food Stores, Inc.*, 2005 WL 1258932 at *6 (M.D.N.C. May 26, 2005).  Thus, "rumors" of alleged discriminatory acts cannot support Plaintiffs' claims against the City.

### 6. *Plaintiffs' Dismissed Disparate Treatment and Retaliation Claims Cannot Be Aggregated to Support a Hostile Work Environment Claim.*

Plaintiffs' disparate treatment and discipline claims have been dismissed. Plaintiffs' retaliation claims have been dismissed.  Yet Plaintiffs seek to use these same alleged incidents to support their hostile work environment claims.  The whole cannot be more than the sum of its parts.  These events alleged by Plaintiffs are not individually

36

discriminatory as standalone events and they cannot be tied together through rumor and innuendo to create an actionable hostile work environment based on race.

In *Meritor Savings Bank v. Vinson,* the seminal case on Title VII hostile work environment claims, the Supreme Court specifically distinguished discrimination with tangible or economic losses, such as disparate treatment and failure to promote, with discriminatory harassment leading to noneconomic injury.  477 U.S. 57, 64-67 (1986). Due to this distinction, allegations of "patterns of discrimination" which constitute discrete acts "must be challenged as separate statutory discrimination and retaliation claims." *McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008). Plaintiffs cannot "aggregate" discrete acts of discrimination to create a cognizable hostile work environment claim.  *McCann*, 526 F.3d 1370; *Parekh v. Swissport Cargo Servs., Inc.,* 2009 WL 290465 at *5 (E.D.N.Y. Feb. 5, 2009)("Plaintiff's complaints concerning unfair disciplinary actions, shift changes, reduction in manpower, wrongfully withheld vacation time, failure to provide him with proper equipment, workplace transfers, failure to promote, and his termination" together do not constitute a hostile work environment claim.); *Na'im v. Rice*, 577 F. Supp. 2d 361, 377 (D.D.C. 2008)("[P]laintiff cannot simply reiterate her discrimination claims in an effort to build up a hostile work environment claim.");  *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 108 (D.D.C. 2005); *Parker v. Del. Dep't of Pub. Safety*, 11 F.Supp.2d 467, 475 (D. Del. 1998).

Thus, Plaintiffs' dismissed claims for disparate treatment and retaliation cannot form the basis for their hostile work environment claims.  Absent these claims, Plaintiffs are left with nothing more than baseless rumors and allegations that they circulated

amongst themselves.  These allegations are insufficient to support a finding that Plaintiffs were subject to racial harassment in the work environment that was either objectively or subjectively "severe or pervasive" and Plaintiffs' claims should be dismissed.

II.    THE CITY IS ENTITLED TO SUMMARY JUDGMENT BASED ON THE *FARAGHER/ELLERTH* AFFIRMATIVE DEFENSE.

An employer has an affirmative defense to allegations of harassment that have not resulted in a tangible employment action when the employer can prove: (1) "that the employer exercised reasonable care to prevent and to correct promptly any [] harassing behavior," and (2) "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *See Faragher v City of Boca Raton,* 524 U.S. 775, 807–08 (1998); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 762–63, 765 (1998).

### A. The First Prong of the Affirmative Defense is Satisfied.

The requirement to make reasonable efforts to prevent harassing behavior is satisfied when an employer adopts and disseminates an anti-harassment policy and "the existence of such a policy militates strongly in favor of a conclusion that the employer exercised reasonable care to prevent and promptly correct [] harassment."  *Brown v. Perry*, 184 F.3d 388, 396 (4th Cir. 1999).  Furthermore, an employer corrects harassing behavior when it investigates complaints of harassment and acts accordingly.  *See, e.g.*, *Crockett v. Mission Hosp., Inc.*, 717 F.3d 348, 358 (4th Cir. 2013) (finding the first prong satisfied when the defendant showed a "fully-functioning anti-harassment policy and its undertaking of a prompt and thorough investigation"); *Dowdy v. North Carolina*, 23 F.

38

App'x 121, 124 (4th Cir. 2001) (per curiam).

1. *The City had an Anti-Harassment Policy and Plaintiffs Understood that They Should Bring Any Complaints Through their Chain of Command.*

The City maintained an appropriate anti-harassment policy during the entirety of the time period relevant to this case. Ex. 36. Furthermore, Plaintiffs understood that the proper procedure to register a workplace complaint in the GPD was to use the chain of command. Plaintiffs also could go outside of the chain of command to the City Manager. Ex. 26 at 34-35; Ex. 43 at 26-28; Ex. 11 at 62. In fact, Plaintiffs brought their concerns directly to the City Manager in the 26 August 2005 meeting. Ex. 10 at 61.

2. *When the City Became Aware of the Alleged Harassment, it Took Prompt Steps to Investigate and Correct any Problems.*

In reaction to the meeting with Graves, Hunter, and Wallace, under direction from City Manager Johnson, Wray had his command staff review a number of internal disciplinary issues to determine if procedures had been followed. Ex. 10 at 92-93; Ex. 13 at 101-04. Separately, in October 2005 the City Legal Department began a review of the GPD and the concerns of the African-American officers. Ex. 13 at 101-04; Ex. 14. Additionally, in November 2005, the City Manager engaged a law enforcement consulting agency, Risk Management Associates ("RMA") to conduct a review of certain alleged issues within the GPD. (Am. Complt. ¶¶ 96-98.) *See also* Ex. 13 at 101-04.

Plaintiffs agree that the investigations of the allegations made by African-American officers were an appropriate and sufficient response to the concerns raised by the officers. Ex. 20 at 117-19; Ex. 22 at 103-04; Ex. 21 at 112; Ex. 10 at 98-101.

**B.  The Second Prong of the Affirmative Defense is Satisfied.**

The second prong is satisfied when an employee fails to use the procedures that are in place. "If Title VII's prohibitions . . . are to be effective, employees must report improper behavior to company officials." *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 269 (4th Cir. 2001). Fear of retaliation does not excuse an employee from this duty.  *Id.* at 270; *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, (4th Cir. 2001). Nor is a belief that reporting harassment would be futile "a reasonable basis for failing to take advantage of any preventive or corrective opportunities." *Barrett*, 240 F.3d at 268.

Plaintiffs unreasonably failed to take advantage of available preventative and corrective measures.  Plaintiffs all knew that complaints should go up the chain of command, but consciously chose not to use this procedure. In fact, Plaintiffs Morton and Stevenson testified that Hunter discouraged them from using GPD's established complaint procedures.  Ex. 39 at 143-145; Ex. 48, at 32-33.

Because the City had an appropriate anti-harassment policy, the Plaintiffs unreasonably failed to utilize methods available to them for registering complaints about the workplace, and the City took prompt steps to investigate and correct any problems when those problems were brought to its attention, the City is entitled to the *Faragher/Ellerth* affirmative defense and cannot be held liable for Plaintiffs' claims.

## CONCLUSION

For the reasons set forth above and in the attached addenda, the City respectfully request that this Court grant its Motion for Summary Judgment and provide any such further relief that the Court deems appropriate under the circumstances.

40

This the 15th day of August, 2013.

/s/ Alan W. Duncan
Alan W. Duncan
N.C. State Bar No. 8736
Allison O. Van Laningham
N.C. State Bar No. 23430
VAN LANINGHAM DUNCAN PLLC
300 N. Greene St., Suite 850
Greensboro, NC 27401
Telephone: 336-645-3320
Facsimile: 336-645-3330
aduncan@vldlitigation.com
avanlaningham@vldlitigation.com

/s/ Patrick M. Kane
Patrick M. Kane
N.C. State Bar No. 36861
SMITH MOORE LEATHERWOOD LLP
300 N. Greene St., Suite 1400
Greensboro, NC 27401
Telephone: 336-378-5200
Facsimile: 336-378-5400
pat.kane@smithmoorelaw.com

*Attorneys for the City of Greensboro*

41

CERTIFICATE OF SERVICE

The undersigned certifies that on this date the foregoing document was filed with the Clerk through the CM/ECF system, which will send notification of filing to counsel of record.

This the 15th day of August, 2013.

/s/ Patrick M. Kane
Patrick M. Kane

42

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No.: 1:09cv934

LAWRENCE ALEXANDER JR., et al.,

        Plaintiffs,

    v.

THE CITY OF GREENSBORO

        Defendant.

**DEFENDANT CITY OF GREENSBORO'S REPLY BRIEF IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

The City of Greensboro (the "City") files this Reply in support of its Summary Judgment Motion. Plaintiffs' hostile work environment claims should be dismissed.

## ARGUMENT AND CITATIONS OF AUTHORITY

Plaintiffs' response to the City's Summary Judgment Motion is filled with sensational, inadmissible, and mischaracterized statements, often made without any record citation. Although Plaintiffs suggest these statements are sufficient to allow their 35 individual hostile work environment claims to proceed, the response lacks evidence or legal authority to counter the evidence and legal authority supporting the City's Motion. In fact, Plaintiffs ignore most of the City's arguments. Plaintiffs do not address the impact of their lack of contemporaneous knowledge of alleged acts, their inability to prove their claims through rumors, and their inability to prove their claims through allegations relating to off-duty assignments and specialized schools.[1] Instead, Plaintiffs focus on a disparate treatment-type analysis of investigations; to support their individual claims, Plaintiffs ask the Court to parse through Interrogatory Responses served 4 January 2012 and totaling approximately 70 pages.[2]

As an excuse for shifting to the Court each Plaintiff's individual burden to demonstrate his or her own hostile work environment, Plaintiffs reference the "frenzied pace of this litigation" and that almost 60 depositions have been taken and 40,000 pages

---

[1]Plaintiffs appear to have abandoned these bases for their claims, as they removed allegations about off-duty work and specialized schools when they cut and pasted their interrogatory responses into their Appendices. *Compare* Doc. No. 172, pp. 33, 41, 47, 68 *with* Doc. No. 159, 163, 170, 160.

[2] Plaintiffs' individual Appendices are, with few exceptions, "cut and pasted" portions of their individual Interrogatory Responses, supported only by citation to those Responses.

of documents have been produced by the City (at Plaintiffs' request).  Doc. No. 134, p. 8.

What is most striking is that after all the discovery done in this case, the best Plaintiffs

can do with respect to their individual claims is to point back to these Interrogatory

Responses from 18 months ago (a significant portion of which were proven to be false

during the course of discovery).  Plaintiffs' response simply does not provide sufficient

evidence or legal authority to overcome the City's properly supported Motion.

A.    **Plaintiffs' Contentions About the Motivations of Wray Demonstrate the City's Entitlement to Summary Judgment.**

Plaintiffs' purported "facts" section begins with an allegation, without citation,

that "[f]rom the outset of the Wray administration, Wray and his Deputy Chief, [] Brady,

took it upon themselves to 'clean up the mess' left in the Department by Chief Robert

White, an African-American and Wray's predecessor as Chief, who had made strides

towards integrating the Department's command structure."  Doc. No. 134, p. 3. This

statement is typical of many in Plaintiffs' brief, in that it is false.  The facts are that "at

the outset of the Wray Administration," *and for the entire first year of the Wray*

*administration*, the Deputy Chief was Tony Scales, an African-American whom Wray

had placed in that position.  Ex. A, p. 15.  Brady was not promoted to Deputy Chief until

September 2004 when Scales retired.  Ex. B, p. 10; Ex. C, p. 30.

Plaintiffs then note that upon Scales' retirement in September 2004, he warned

Wray that African-American officers were "going to come after" Wray because they had

long felt they were treated unfairly but would not complain while there was an African-

American Chief.  Doc. No. 134, p. 3.  Plaintiffs contend that *this conversation with*

Case 1:09-cv-00934-TDS-JEP   Document 180   Filed 09/13/13   Page 3 of 23

*Scales* was the impetus for Wray to "[come] out swinging."  *Id.*  As an initial matter, there is no evidence to support that Wray "came out swinging."  However, the contention is significant for two reasons.  First, Plaintiffs argue that Wray's "motivation" did not arise *until September 2004*, with the Scales conversation.  Plaintiffs have impliedly conceded that Wray was not "motivated" to create an alleged hostile work environment until that time.  The Court can ignore acts alleged prior to September 2004.

Second, Plaintiffs' argument that Wray "did not suffer criticism lightly" and "came out swinging" after the Scales conversation corresponds with what the evidence has revealed—Wray did not appreciate challengers to his authority, regardless of race. *Compare* Doc. No. 106, pp. 8-10 *with* Doc. No. 134, pp. 3-4, n. 2.  Moreover, not only does Plaintiffs' contention as to Wray's alleged motivation confirm the City's position of insufficient evidence of racial motive, Plaintiffs affirmatively argue that there is a *non-race based* motive for Wray's alleged actions.  Plaintiffs themselves testified that Wray was vindictive against any challenger, white or black.  Ex. D, p. 213-14; Ex. E, p. 57. Plaintiffs argue Wray felt challenged by Scales' September 2004 warning and, because he "did not suffer criticism lightly, came out swinging." Plaintiffs' theory, not supported by evidence, appears to be that because Wray was challenged by African-American officers, his response must be racially motivated.  Such a theory is also not supported in the law. *See Sharp v. BellSouth Advertising & Publishing Corp.*, 232 F. Supp. 2d 1369 (N.D. Ga. 2002), *aff'd*, 61 F. App'x 671 (11th Cir. 2003)(dismissing race discrimination claims based on speculation that an employer would have reacted differently to

employee's situation if the employee had been the same race as the individuals making complaints about her).  Plaintiffs argue that Wray's alleged motivation came from the *challenge*, not the *race of the group* Scales warned would challenge him.  The evidence is that Wray's reaction would have been the same regardless of the race of the challengers. *See* Doc. No. 106, pp. 8-10. Having conceded an essential element of their claims (the alleged harassment must be "based on race,") Plaintiffs' claims should be dismissed.

**B.**    **Plaintiffs' Allegations Regarding Wray's "Inner Circle" Are Not Supported by the Record and do Not Save Plaintiffs' Claims.**

Plaintiffs imply that Wray regarded all African-American officers "as mere 'window dressing.'"  Doc. No. 134, p. 4.  The actual fact is that *one* witness (Hastings) alleged he heard Wray make that statement with respect to *one* African-American officer (Rankin), in the context of Wray assigning an additional African-American detective to SID.  *Id.*  Thus, Plaintiffs' statement is misplaced when viewed in the correct context.

Further, whether Wray excluded non-Plaintiffs from the meetings of his "inner circle" is immaterial to Plaintiffs' individual claims.  As this Court has stated, "each Plaintiff individually must allege facts plausibly showing that he or she is entitled to relief" and evidence that non-Plaintiffs were excluded from the decision-making process "do not show that any individual Plaintiff is entitled to relief."  Doc. No. 18, pp. 28-29.

**C.**    **Plaintiffs' Allegations of Disparate Treatment in Investigations Do Not Save their Hostile Work Environment Claims.**

Plaintiffs focus on a comparison of investigations of African-American officers with investigations of white officers.  Doc. No. 134, pp. 6-28.  Plaintiffs are making

disparate treatment arguments, but all their disparate treatment claims have been dismissed. Doc. No. 18, p. 59; Doc. No. 96. Plaintiffs cannot reiterate and aggregate disparate treatment allegations (especially when those claims have been evaluated and dismissed) to prove a hostile work environment. *See* Doc. No. 106, pp. 36-38.

Plaintiffs' contentions regarding investigations do not support a hostile work environment in any event. What they do show is precisely what the City noted in its initial brief—that Plaintiffs ascribe racial motives to essentially all activities, even where there is no factual evidence to support such a contention. *See* Doc. No. 106, p. 12.

1.  **Overview of Investigations.**

Plaintiffs' purported "overview of investigations" is revealing in that it spans two and a half pages without a single citation supporting the representations made. It is no different than a complaint and is not sufficient to rebut the City's properly supported Motion. A plaintiff cannot rely on such assertions "to avoid summary judgment; he must come forward with evidence to demonstrate that there is an issue requiring resolution at trial." *Ware v. Potter*, 106 F. App'x 829, 833 (4th Cir. 2004) (per curiam). The reason for the absence of citations is not a mystery—the majority of the statements have no record support.

For example, Plaintiffs assert that Wray and Brady assigned "Sanders, who was merely one rank higher than a new recruit, to take the lead on secret investigations of numerous black officers." Doc. No. 134, p. 6. The implication, that Sanders was unqualified to conduct officer investigations, is unsupported and belied by Plaintiffs' own

testimony.   Cuthbertson, also in SID, testified that he did not feel comfortable investigating police officers because it took a "special skill set and body of knowledge." Ex. F, p. 158.  He testified that Sanders had a "vast amount of experience" and that it was appropriate for Sanders to be assigned police officer investigations.  *Id.*

Plaintiffs next allege that Sanders investigated African-American officers "long after it became manifestly apparent that there was no basis whatsoever to the allegations; and only because of the color of the officer's skin."  Doc. No. 134, p. 6.  Plaintiffs claim that when Sanders was assigned to investigate white officers, the focus was to exonerate them, "even in the face of compelling evidence of misconduct."  *Id.*  This is one of the most sensational statements made by Plaintiffs, but it is unsupported by any record evidence.  The actual facts, as set forth in the City's brief and discussed below, show that investigations African-American officer were precipitated by material allegations of misconduct and that there was no difference in the way investigations of African-American officers and white officers were handled.  *See* Doc. 106, pp. 23-26.

Similarly, Plaintiffs allege that Sanders' use of certain equipment was "to the detriment of legitimate investigations."  *Id.*, p. 7.  Again, no record evidence is cited, because none exists.  Plaintiffs also allege, without citation, that Sanders showed photos of African-American officers "without any reasonable suspicion of unlawful conduct." *Id.*  By contrast, the City discussed every instance in which Sanders showed an African-American officer's photo during an investigation and, *with citations to evidence*, showed that there was an explanation for each use of a photo.  *See* Doc. No. 106, pp. 16-21.

Finally, Plaintiffs' coup de grace is that investigations of African-American officers resulted in only one conviction. This is actually the most compelling evidence that the investigations were *not* improper—the result of almost every investigation was that the subject was cleared of criminal wrongdoing. Doc. No. 106, p. 11-12.

## 2.    <u>Investigations of Officers by SID Were Not Improper.</u>

Plaintiffs spend three pages alleging that Wray violated his own directives by having SID investigate criminal allegations regarding officers. Doc. No. 134, pp. 8-11. But, as this Court has noted, a violation of GPD policies, standing alone, does not provide grounds for a Title VII claim. Doc. No. 18, p. 49.

Further, when Wray became Chief, criminal allegations against officers were investigated by "SIRT" teams under the Special Intelligence command and supervised by Sergeant Craig McMinn. Doc. No. 134, p. 8. Sanders and Robert Edwards had already beclome Special Intelligence officers assigned to investigate criminal allegations against officers when Robert White was Chief. Ex. B, p. 298. In Spring 2004, Wray eliminated SIRT and implemented a directive that on its face assigned criminal investigations of officers to CID. Doc. No. 134, p. 8. Plaintiffs allege this change meant that Sanders, an SID detective, had no authority to investigate officers, even if assigned by the Chief. *Id.* Yet, Plaintiffs' own purported expert, Ken Johnson, testified that a chief has discretion to deviate from established procedure in assigning criminal investigations of officers and that he himself, while at the Raleigh Police Department ("RPD"), had been assigned investigations of officers by the RPD Chief outside of the standard RPD practice for

officer investigations.   Ex. G, pp. 44-48, 64-65.   Likewise, Plaintiffs Cuthbertson and

Rankin, who were in SID and investigated African-American officers after the directive

was changed, testified that there was nothing improper about those investigations.   *See*

Doc. No. 106, pp. 22-23.   Cuthbertson acknowledged that the Chief had authority to refer

these investigations to Special Intelligence.   *Id.* at p. 22.

Finally, while Plaintiffs make much about SID investigating instead of CID, there

is no explanation how it created a hostile work environment.   Plaintiffs do not provide

any evidence that a CID investigation of alleged criminal activity was somehow

preferable to an SID investigation.   In fact, Plaintiffs' complaints about investigations

seem to be the same whether they were conducted by SID or CID (compare allegations

regarding Stacy Morton, (SID investigation), with allegations regarding Darrin Davis,

(CID investigation)).[3]   Doc. No. 134, pp. 11-16; Doc. No. 106, p. 12.

> **3.    Plaintiffs' Allegations of Disparate Treatment in Investigations Do Not
> Support Their Hostile Work Environment Claims.**

Plaintiffs next offer a disparate treatment analysis, comparing investigations of six

African-American officers (three Plaintiffs and three non-Plaintiffs) with investigations

of five white officers.   The City previously demonstrated, *with evidence*, that the

investigations of Morton, Davis, Hinson, Fulmore, and ███████ were objectively

reasonable and do not support Plaintiffs' individual claims.   Doc. No. 106, pp. 23-26.

**Morton:**  The majority of Plaintiffs' Morton discussion is a "cut and paste" from his

---

[3] The evidence also demonstrates that the assignment of officer investigations to SID was
not based on race.  *See* Doc. No. 106, pp. 11-12.

Interrogatory Response. It is filled with inadmissible, self-serving statements unsupported by any evidence, and in some cases flat out false. For example, Plaintiffs allege that an officer had never in "20 years of GPD history" been terminated for violating certain directives, Doc. No. 134, p. 13, but provide no citation other than to Morton's own self-serving interrogatory response. Similarly, Plaintiffs falsely allege that "by directives, the Chief usually defers to the Board's determination." *Id.* In fact, the directives state that "the guilt or innocence of the accused will be determined solely by the Board Chairman," the Chief. Ex. H, pp. 1, 4. Finally, everything with Morton took place before February 2004. This is a full six months before the conversation between Scales and Wray that Plaintiffs contend was the impetus for Wray to begin his alleged harassment of African-American officers. Plaintiffs' own argument forecloses the Morton situation from supporting a hostile work environment based on race.

**D. Davis**: Plaintiffs' discussion of Davis is also a "cut and paste" from his Interrogatory Response, with the same deficiencies as Morton's. Plaintiffs allege that Wray violated GPD directives when, after the DA received an anonymous letter regarding Davis' conduct, Wray initiated a criminal investigation after an administrative investigation.[4] Doc. No. 134, p. 16. They then wrongly contend that GPD Directive 7.1.6 mandates that a criminal investigation "must be done 'prior to or concurrent with" administrative investigation. *Id.* In fact, it states that "*[s]ome investigations*, due to their nature, will be conducted as a criminal investigation prior to or concurrently with an administrative

---

[4]If Plaintiffs' theory that Wray  to put African-American officers in jail was correct, he would have criminally investigated Davis from the outset, which he did not do.

investigation." Ex. I. Plaintiff Phifer, who worked in Internal Affairs, testified that there were situations when a criminal investigation would be done after an administrative investigation. Ex. J, p. 87. Finally, Davis' situation took place prior to the September 2004 event that Plaintiffs allege triggered Wray's motivation for harassment.

**Pryor**: Plaintiffs' allegations regarding Pryor are undermined by the fact that Plaintiff Phifer, Pryor's commanding officer, testified that the situation was handled by Wray to Phifer's satisfaction. Ex. J, p. 56, 60-61.

███████████████    No Plaintiff referenced this as something that contributed to their hostile work environment. There is no evidence that any Plaintiff was ever aware of this situation. An act of which a Plaintiff is not aware cannot contribute to a hostile work environment, *see* Doc. No. 106, p. 28.

█████    The situation with Officer █████ demonstrates why courts have repeatedly held that "rumors" cannot create an actionable hostile work environment. *See* Doc. No. 106, pp. 35-36. Most Plaintiffs had no firsthand knowledge of the █████ investigation, and when confronted at their depositions with the fact that Wray (while an Assistant Chief) had concurred with the recommendation that █████ be terminated, Plaintiffs were surprised. Ex. K, pp. 117-118, Ex. L, p. 103, Ex. M, pp. 63-64. In fact, Plaintiff McDonald testified that in light of the true facts, he was withdrawing his allegation that the █████ situation was evidence of "extraordinary hostility towards black officers in the Wray administration." Ex. N, pp 34, 68. Plaintiff Rogers testified that Wray was

consistent with both ███ and Morton. Ex. D, p. 214.[5]  The ███ situation and Heard's transfer occurred prior to September 2004 when Plaintiffs contend that Wray became motivated to create a hostile work environment.

**James Hinson**:  Plaintiffs' discussion of Hinson is misleading.  First, Plaintiffs omit the critical fact that the investigation began while Scales, not Wray, was Chief.  Ex. B, p. 74. When Scales first learned of the investigation, he directed it to continue.  *Id.*  Second, Plaintiffs omit that when Thacker and Wyrick were brought in by Wray to conduct an additional administrative investigation after the conclusion of the original investigation, additional allegations of wrongdoing had surfaced: defrauding the GPD by working off-duty while on-duty, falsely representing a non-profit organization, and operating an illegal security company.  Ex. P, pp 172-76, 183-84.  Finally, this section contains perhaps Plaintiffs' most striking admission, that "Sanders and Bissett advised [Crotts] that the criminal investigation [of Hinson] had reached a dead end, that there would be no criminal charges, and that they were turning the matter over to Internal Affairs to conduct an administrative investigation."  Doc. No. 134, p. 22-23.  Thus, Sanders and Bissett, who according to Plaintiffs would do anything to put an African-American police officer in jail, *id.* at 42, cleared James Hinson of criminal wrongdoing, and sent the matter to IA, just as protocol directed.  Plaintiffs' theory cannot be reconciled with the facts.

---

[5] Plaintiffs allege that as a result of the ███ situation Wray transferred Plaintiff Heard, who was ███ supervisor, to "District 3."  Doc. No. 134, pp. 19-20.  While Plaintiffs contend that District 3 was the "least desirable district within GPD's jurisdiction," *id.* at 20, Heard testified that he did not like District 3 because there were few African-American officers.  Ex. O, Heard Dep. pp. 126-27.  Such testimony makes Plaintiffs' purported outrage at Wray's "inner circle" of white individuals seem misplaced.

**Fulmore**:    Plaintiffs allege that the "serial investigations of Fulmore were a topic of great concern to many Plaintiffs." Doc. No. 134, p. 24.  However, Fulmore, a plaintiff in another action, and whose response to the City's summary judgment motion in that case Plaintiffs incorporate by reference, does not contend that there were not sufficient bases for the investigations.  *See* Case No. 09-CV-373, Doc. No. 89.

████████    ████████    a non-sworn employee who is not a Plaintiff, was regularly engaged in prostitution and was caught soliciting a prostitute (Plaintiff Rankin's sister-in-law) during a prostitution investigation.   Doc. No. 134, p. 25; Ex. Q, pp. 51-52.  Plaintiffs' contention that this caused a hostile work environment is perplexing.

████████    Plaintiffs' discussion of Officer ████████ is significant for what it shows about Plaintiffs' case theory.  Initially, it shows that SID officers surveilled a *white officer*, undermining the allegations that SID "targeted" African-Americans.   More importantly, Plaintiffs complain that the SID officers did not immediately notify IA of their investigation. Doc. No. 134, p. 26.  Plaintiffs make this same allegation about SID's investigation of James Hinson, *id.* at 23, which demonstrates that Plaintiffs have constructed a theory pursuant to which *everything* must be racially tinged.  According to Plaintiffs' theory, the same SID act—not notifying IA of a criminal allegation against an officer—is racially motivated for one reason during an African-American officer investigation, and racially motivated for another reason during a white officer investigation.   What a comparison of the facts of the Hinson and ████████ investigations actually shows is that SID operated similarly in its investigations,

regardless of an officer's race.

███████    SBI Agent James Bowman, whose testimony Plaintiffs emphasize regarding Fulmore, *see* pp. 14-15, *infra*, stated in an interview with GPD that after the SBI's investigation of Officer ███████ brother, Bowman told Lojko that the SBI had already determined that ██████ had no knowledge of his brother's activities.    Ex. R, pp. 5-6. Bowman further told Lojko that he hoped the incident with ███████ brother would not reflect negatively on ██████ .   *Id.*   Based on this communication from Bowman, it was reasonable that Lojko would proceed in the manner he did.   The evidence does not show that ██████ received preferential treatment because he was white and this situation does not support Plaintiffs' hostile work environment claims.

███████    Officer ███████ is white. While one witness said he is "biracial," Ex. S, p. 67, other witnesses asked about ███████ race, including Plaintiffs, testified that he is white.  Ex. A, p. 143, Ex. T, p. 145, Ex. U, p. 95-96,  Ex. V, p. 70, Ex. E, p. 115.  Thus, the ██████ investigation and Wray's alleged desire that he be found guilty of wrongdoing, shows that Wray's alleged "disgust" and "animosity" towards some officers was *not based on race*.   Furthermore, Plaintiffs' attempt to compare the polygraph between ██████ and Fulmore shows Plaintiffs' willingness to misstate facts to fit their theory.   Plaintiffs falsely allege that "Fulmore was polygraphed twice, once in the criminal investigation and once in the subsequent administrative investigation."  Doc. No. 134, p. 28, n. 13.  The testimony Plaintiffs cite in support is from IA Corporal Trey Davis, who stated that in the Fulmore criminal investigation, Sanders polygraphed

prostitute Brenda Weidman, while *Davis himself* had Fulmore polygraphed in the subsequent administrative investigation. *See* Ex. W, pp. 29-30. Davis' report of his investigation confirms that the only polygraph of Fulmore was done by Davis. Ex. X, p. 3, 5, 13. Cpl. Davis was the same officer who determined that the allegations against ███████ should be sustained. Thus, in one situation Plaintiffs present Davis (an African-American) as the person doing the right thing with respect to ███████ while in the next breath complaining that Davis ordered a polygraph for Fulmore.

**4.        The Bowman Affidavit *Supports* the City's Motion.**

Plaintiffs submit an affidavit from SBI Agent Bowman relating to Fulmore, which undermines rather than supports Plaintiffs' claims.[6] It makes clear that the Fulmore investigations were conducted with other agencies that also received allegations. The Affidavit demonstrates that there were appropriate bases for investigating Fulmore.

Plaintiffs emphasize Bowman's statement to Wray that it was Bowman's opinion that Sanders had "tunnel vision" with respect to Fulmore. What Bowman's statement actually reveals is a non-race-based reason for Sanders' investigation of Fulmore, that he believed Fulmore was guilty of criminal conduct.[7] Doc. No. 172-20, ¶ 15. Bowman did not tell Wray that he believed Sanders' alleged "tunnel vision" was because Fulmore was African-American. *C.f. Mayberry v. Mundy Contract Maintenance, Inc.*, 197 F. App'x

---

[6] Although Bowman's affidavit is about Fulmore and captioned in his case, Fulmore did not submit it in opposition to the City's summary judgment motion on his hostile work environment claim, presumably realizing that it would hurt Fulmore's case.

[7] Sanders was not the only one who believed Fulmore was guilty of wrongdoing. Rick Ball testified that Fulmore (and J. Hinson as well) should have been fired. Ex. Y, Ball Dep. pp. 85-89.

314, 316 (holding that a belief that an employee engaged in wrongdoing is a non-discriminatory reason for an employment action).

Finally, while Plaintiffs claim that Sanders assisting the SBI in investigating Fulmore violated the directive that criminal investigations of officers be assigned to CID, Sanders began working with the SBI in "the latter part of 2003," Doc. No. 172-20, ¶¶ 5, 7, and Wray did not implement that directive until Spring 2004. Doc. No. 134, p. 10.

### 5.    The City Manager Took Immediate Action When Confronted with Formal Complaints of Alleged Discrimination.

Seeking to rebut the City's meritorious *Faragher/Ellerth* defense, Plaintiffs suggest that hostile work environment complaints were made to the City Manager and went unheeded. Plaintiffs once again mischaracterize evidence, suggesting that Johnson did not act on concerns of which he was aware until a Fall 2005 SBI meeting. Plaintiffs' timeline and the alleged catalyst for Johnson's actions are unsupported by the record.

The City Manager's office received an NAACP letter on 21 June 2005.[8] Doc. No. 172-2. Johnson immediately asked Wray for a response. Ex. Z, p. 75. Wray enlisted an outside consultant, Gil Kleinknecht, to review certain GPD units. Ex. AA. Johnson met with the NAACP and responded to concerns on 19 July 2005. Ex. Z, pp. 78-79.

Meanwhile, Wray reached out to African-American officers and Plaintiff Graves

---

[8] When an employer has a specific complaint procedure, as the GPD did, the employer's duty to "promptly correct" harassment under *Faragher/Ellerth* is triggered when it receives a proper complaint from an employee. *See Weger v. City of Ladue*, 500 F.3d 710, 721 (8th Cir. 2007); *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1364 (11th Cir. 1999). There is no evidence that the NAACP was complaining on behalf of any Plaintiff. The letter stated that it was sent on behalf of taxpayers, not any GPD employees.

was asked to gather officer concerns.[9]  Doc. No. 151-1.  Throughout July 2005, there were African-American officer meetings and Plaintiffs Graves, Hunter, and Wallace met with Wray, the City Attorney, and the City Manager to present concerns on 26 August 2005.  Ex. BB, p. 61-62. Over half the Plaintiffs now allege that they "complained" about their alleged hostile work environment by way of Graves, Hunter, and Wallace.[10]

The City Manager then directed Wray to conduct an internal investigation of the issues.  Ex. Z at 97.  He also initiated a separate City Legal review, *id.* at 98, which involved dozens of interviews, Doc. No. 172-6, p. 2, and by October 2005 he engaged RMA to assist.  *Id.* pp. 2-4, 10-13; Ex. Z at 123-25.  Plaintiffs' contention that Johnson's investigation initiation was "not as a result of the meeting with Graves, Hunter, and Wallace," Doc. No. 134, p. 33, is a misplaced attempt to avoid *Faragher/Ellerth*. Johnson testified that as a result of the Graves, Hunter and Wallace meeting, he ordered Wray to conduct an internal investigation and that meeting with was a primary factor in the additional investigations he commissioned.  Ex. Z, p. 102, 314-15.

### 6.    The City Legal and RMA Investigations were Appropriate Responses to the Concerns the Expressed to the City Manager by Plaintiffs.

Plaintiffs admitted that Johnson assigning City Legal to investigate their concerns and engaging RMA was an appropriate response.  *See* Doc. No. 106, p. 39.  Plaintiffs also contend these investigations caused the resignation of a number of GPD employees that

---

[9] Plaintiffs conveniently omit that the meetings of African-American officers that resulted in Plaintiffs Graves, Hunter, and Wallace meeting with Wray and the City Manager were prompted by *Wray's request* to hear the officers' concerns.  Doc. No. 134, pp. 31-32.
[10] *See* Appendices for these Plaintiffs.

they contend were creating the hostile work environment. Doc. No. 134, p. 34-35. Thus, per their allegations, the investigations resulted in a subjectively satisfactory outcome.[11]

To the extent Plaintiffs seek to use either the City Legal Report or Johnson's statements following the investigations and Wray's resignation as hostile work environment admissions, such efforts are misguided. The City Legal Report formed the primary opposition to the City's Motion to Dismiss prior to discovery. *See* Doc. No. 15. However, extensive discovery showed that many purported findings were not accurate. Plaintiffs recognized, in light of the record evidence, that the document does not support them and reference only a single statement. Doc. No. 134, p. 35.

With respect to Johnson's 10 January 2006 comments following Wray's resignation, *id.* at 35-36, Johnson testified that he did not have a full understanding of all the information regarding GPD situations. Ex. Z, pp. 306-07. These comments do not support Plaintiffs' claims in the face of contrary facts developed over a period of months after Wray's resignation and through the extensive discovery in this litigation.

### 7-8.  Changes to the Chain of Command and the Restructuring of GPD Do Not Support Plaintiffs' Claims.

Plaintiffs allege that chain of command changes and the Special Intelligence transfer to the Metropolitan Operations Bureau increased the chance that investigations might be conducted inappropriately. Doc. No. 134, pp. 36-38. However, even an employee's dissatisfaction with an inappropriately conducted investigation does not

---

[11] In fact, Plaintiff Graves avers that the City Manager's response made him "happy," Doc. No. 151-1, ¶ 2, and Plaintiff Rogers said that the City Manager's actions in response to Plaintiffs' concerns were in "good faith." Doc. No. 105-22 at 103-04.

establish racial discrimination. *See Flanagan v. Ashcroft*, 316 F.3d 728; 729-30 (7th Cir.

2003); *Fox v. City of Greensboro*, 807 F. Supp. 2d 476, 491 (M.D.N.C. 2011); *Rattigan

v. Gonzales*, 503 F. Supp. 2d 56, 72-73, 78-82 (D.D.C. 2007). Moreover, while Plaintiffs

contend that Brady did not have the experience to oversee Special Intelligence and its

investigations, Brady had prior experience in supervising Special Intelligence before

Wray placed that unit back under his command—Brady had previously supervised

Special Intelligence and Internal Affairs as Captain of the Special Investigations

Division, a position he was appointed to by Chief White. Ex. B, p. 9, 30-34.

### 9. The Use of Photographs in Investigations was Objectively Reasonable and Does Not Support Plaintiffs' Claims.

The City previously set forth the facts related to the use of Plaintiffs' photos. Doc.

No. 106, pp. 16-21. Nothing in Plaintiffs' brief rebuts those facts and the Bellamy

testimony regarding what he was allegedly said by informants is inadmissible hearsay.[12]

### 10. The Use of Tracking Devices in Investigations on Officers Other than Plaintiffs Does Not Support Plaintiffs' Claims.

There is no evidence that a tracking device was used in an investigation of any

Plaintiff nor that any Plaintiff was aware of the Fulmore or Hinson tracking devices until,

at the earliest, discovery of the Hinson tracking device and the subsequent media reports.

### D. Plaintiffs' Legal Argument is Almost Non-Existent.

Plaintiffs' legal argument consists of (1) the summary judgment standard, (2) the

---

[12] It is telling that although Plaintiffs' hostile work environment claims survived the City's 12(b)(6) motion on the basis of allegations about photographs, *see* Doc. No. 18, after discovery revealed the facts, their brief has only three sentences about photographs.

hostile work environment claim elements and a sentence on the analysis of such claims, (3) a parenthetical about the effectiveness of an anti-harassment policy, and (4) absolutely nothing else. Plaintiffs do not respond to the extensive case law in the City's brief and make no attempt to explain why those cases are not dispositive of Plaintiffs' claims. Instead, they make statements such as Plaintiffs "have shown that Wray and Brady directed, and Sanders engaged in, zealous criminal investigations of black officers, often based on the flimsiest of allegations, in an effort to prosecute them. Allegations of white officers' criminal misconduct, in contrast, were swept under the rug." Doc. No. 134, p. 41. As the City has repeatedly shown, such allegations are without merit or record support. The crux of Plaintiffs' argument is that because white officers investigated black officers, there must have been racial motivation. But "[l]aw does not blindly ascribe to race all personal conflicts between individuals of different races. To do so would turn the workplace into a litigious cauldron of racial suspicion. Instead, legally sufficient evidence is required to [support] an actionable claim of discrimination." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 282 (4th Cir. 2000). Plaintiffs do not have the required legally sufficient evidence to support their claims.

Without support, Plaintiffs claim "Defendants pursued black officers to try to put them in jail. Their efforts with respect to their white officer colleagues was much different—to clear them." Doc. No. 134, p. 42. The actual facts are that SID officer investigations were conducted in the same manner, regardless of race. *See* Sec. 3, *supra*.

Plaintiffs concede that the allegations made to support their claims almost

exclusively involve second-hand harassment, and not acts actually directed at them. Doc. No. 34, p. 42. They say this "makes little difference" to their hostile work environment claims because "each Plaintiff was aware of…the racially motivated misconduct." *Id.* The facts are, however, that Plaintiffs were mainly "aware" of rumors spread among them. Rumors cannot support a hostile work environment claim. *See* Doc. No. 106, pp. 35-36. Further, if Plaintiffs were aware of the alleged harassment through conversations with their co-workers, the conversations themselves created the alleged hostile work environment and the conversations are not acts attributable to the City. *See Hayes v. Lowe's Food Stores, Inc.*, 2005 WL 1258932 at *6 (M.D.N.C. May 26, 2005).

Finally, Plaintiffs rest their rebuttal to the City's *Faragher/Ellerth* defense on their assertions that Johnson did not heed complaints made regarding alleged concerns of African-American officers.[13] As set forth in Sec. C.5, *supra*, this is a mischaracterization of the record evidence and Plaintiffs' claims are barred.

## CONCLUSION

For the reasons stated herein and in the City's Motion and initial brief, the City respectfully requests that Plaintiffs' hostile work environment claims against the City be dismissed in their entirety with prejudice.

---

[13] Fifteen Plaintiffs say they did not complain about their work environment for fear of retaliation. *See* Appendices. However, fear of retaliation does not excuse an employee from his/her duty to report harassment. *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 270 (4th Cir. 2001).

This the 13th day of September, 2013.

/s/ Alan W. Duncan
Alan W. Duncan
N.C. State Bar No. 8736
Allison O. Van Laningham
N.C. State Bar No. 23430
VAN LANINGHAM DUNCAN PLLC
300 N. Greene St., Suite 850
Greensboro, NC 27401
Telephone: 336-645-3320
Facsimile: 336-645-3330
aduncan@vldlitigation.com
avanlaningham@vldlitigation.com

/s/ Patrick M. Kane
Patrick M. Kane
N.C. State Bar No. 36861
SMITH MOORE LEATHERWOOD LLP
300 N. Greene St., Suite 1400
Greensboro, NC 27401
Telephone: 336-378-5200
Facsimile: 336-378-5400
pat.kane@smithmoorelaw.com

*Attorneys for the City of Greensboro*

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this date the foregoing document was filed with the Clerk through the CM/ECF system, which will send notification of filing to counsel of record.

This the 13th day of September, 2013.

/s/ Patrick M. Kane

Patrick M. Kane

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LAWRENCE ALEXANDER JR., et al.,

        Plaintiffs,

    v.

THE CITY OF GREENSBORO, et al.,

        Defendants.

Civil Action No.: 1:09cv293

LAWRENCE ALEXANDER JR., et al.,

        Plaintiffs,

    v.

THE CITY OF GREENSBORO,

        Defendant.

Civil Action No.: 1:09cv934

## PLAINTIFFS' JOINT RESPONSE IN OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT OF DEFENDANTS CITY OF GREENSBORO, WRAY, BRADY, AND SANDERS ON DISCRIMINATION CLAIMS

Plaintiffs[1] respectfully submit the following joint response to the motions for

summary judgment filed by (1) Defendant the City of Greensboro in *Alexander 934*

---

[1] Plaintiffs Cherry and Pryor notified Plaintiffs' counsel by email this morning that they are terminating the representation and filing *pro se* summary judgment responses. Cherry and Pryor have not responded to emails asking for clarification on whether they are filing responses to all or some of the pending summary judgment motions in *Alexander 293* and *Alexander 934.* Counsel are filing today a motion to withdraw from their representation of Plaintiffs Cherry and Pryor in both cases, but unless and until that motion is granted, they believe they have a duty to protect Cherry's and Pryor's interests by filing this joint response on behalf of all Plaintiffs, including Cherry and Pryor. To the extent that Cherry and Pryor have, in fact, filed *pro se* responses to any of the four pending summary judgment motions in *Alexander 293* and *Alexander 934* which are accepted for

(Docket No. 104), and (2) Defendants Wray, Brady, and Sanders in *Alexander 293* (Docket No. 191). As discussed below, Plaintiffs have adduced overpowering evidence of a racially hostile work environment—certainly enough to raise material issues of fact on the issue—and the Defendants' summary judgment motions must be denied.

## NATURE OF THE MATTER BEFORE THE COURT

Plaintiffs filed the action which became *Alexander 293* in the Superior Court of Guilford County, *inter alia*, seeking redress against Defendants Wray, Brady, and Sanders under 42 U.S.C. § 1981 for a hostile work environment. Defendant the City of Greensboro removed the action to this Court on April 17, 2009. Because Plaintiffs had not yet received right-to-sue letters from EEOC, they did not include in *Alexander 293* claims alleging racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq.* ("Title VII").

Once right-to-sue letters were issued, Plaintiffs filed in this Court a Title VII action, *Alexander 934*, against the City on December 7, 2009. The Court granted the City's motions to dismiss the Title VII hostile workplace claims of Plaintiffs Alston, Blake, Patterson, Young, and D. Stevenson.

The Plaintiffs' only remaining discrimination claims are for a hostile work environment under § 1981 in *Alexander 293* and under Title VII in *Alexander 934*.

## FACTS

The summary judgment evidence that the work environment under Wray was

---

consideration by the Court, then the corresponding response brief(s) filed by undersigned counsel should be deemed filed on behalf of the remaining 38 Plaintiffs.

-2-

hostile to black officers is overwhelming and easily sufficient to raise a jury question.
Indeed, City officials have publicly and privately admitted the existence of a racially
hostile workplace during the Wray administration.

## A.    GPD Defendants' Motivations.

From the outset of the Wray administration, Wray and his Deputy Chief,
Defendant Brady, took it upon themselves to "clean up the mess" left in the Department
by Chief Robert White, an African-American and Wray's predecessor as Chief, who had
made strides towards integrating the Department's command structure.  One of Wray's
missions when he became Chief was to correct a perceived "unhealthy cultural change in
the department" that had occurred under Chief White. (**Exhibit J** p. 26; **Exhibit A** p.37;
*see* **Exhibit K** p. 74).   Wray frequently talked about "restoring the integrity" of the
Department.  **Exhibit A** p.37; *see also* **Exhibit A** p. 73.  From the beginning of Wray's
tenure, he expressed a desire for "strong management" to correct the cultural change that
had occurred under White.  (**Exhibit B** pp. 44, 211).

Wray heard rumblings for many years before he became Chief that black officers
felt that they had been treated unfairly within GPD due to their race. (**Exhibit J** p. 32).
He received warnings soon after he became Chief that because he was white, it would be
"fair game" for black officers to raise these concerns. (*Id.* p. 30).  Wray, who did not
suffer criticism lightly,[2] came out swinging.

---

[2] *E.g.*, (**Exhibit K** p. 72) (Wray always insisted his way was correct, and Vice/Narcotics
Commander Ball "never personally saw him be swayed by anybody's opinion, whether it
be good or bad"); **Exhibit A** p. 15 ("The culture of the organization when Wray was
Chief was rule by fear.  Most officers did not dare challenge Wray"); Plaintiff Stroud

-3-

**B.**  **Black Commanders Excluded from Decision-Making.**

Wray regarded black GPD officers, in his own words, as mere "window dressing" within the Department. (*See* **Exhibit M** p. 64; **Exhibit N** p. 215). As Chief of Police, Wray placed or maintained black officers in command staff positions purely for show, and excluded them from his inner circle of white officers, who held regular meetings behind closed doors where substantive decisions within the Department were made. Wray, for example, promoted two black officers, Tim Bellamy and Annie Stevenson,[3] to Assistant Chief positions shortly after he became Chief. (*See* **Exhibit O** p. 13). According to Bellamy, however, he and Stevenson, however, "very seldom [were] told what's going on." (**Exhibit O** p. 20).

Both Bellamy and Wray worked in the main police headquarters (**Exhibit O** p. 25), and Bellamy observed officers of equal or lesser rank gathering for weekly, closed-door meetings with Wray in the conference room there. (**Exhibit O** p. 29). Those officers included John Wolfe, Craig Hartley, David Watterson, Matt Lojko, Randall Brady, and sometimes Chris Walker, Danny Ingram, and Richard Hunter, whose ranks ranged from Lieutenant to Assistant Chief. All of them were white. (**Exhibit O** pp. 22, 25-26; **Exhibit K** p. 51; **Exhibit A** p. 37).).

---

Affidavit ¶ 4 (Wray's announced at a lineup his advice to subordinates who disagreed with his decisions: " If you don't like it you can leave"); **Exhibit O** p. 45-46 (Bellamy testified, "[Y]ou don't question David Wray"; when GPD officers questioned Wray's decisions, he shunned and isolated them).

[3]

 (Bellamy p. 71).

-4-

Wray and other white officers also met about once a week at K&W and other

Greensboro restaurants, and later at Wray's home.  Black officers were not included.

Plaintiff Brian James (black), Wray's Executive Officer, was never invited to eat with

them. (**Exhibit A** p. 37).

Bellamy, not surprisingly, felt that his exclusion from these meetings undermined

his effectiveness as Assistant Chief. (**Exhibit O** pp. 33-34).

Wray had hired Watterson,[4] a retired GPD Captain, as a "consultant." (**Exhibit O**

p. 26).   The fact that Bellamy, an Assistant Chief under Wray for 2½ years (**Exhibit O** p.

8), had "no idea" (**Exhibit O** p. 27) what Watterson's role was in the Wray

administration[5] illustrates how exclusive the inner circle of white officers surrounding

Wray really was.[6]

---

[4] Richard Ball (white), Commander of Vice/Narcotics during the Wray administration
(**Exhibit K** p. 7), observed that sworn command level officers under Wray, including
Bellamy, had sufficient skills, experience, and dedication to do the work that Watterson
was doing. (**Exhibit K** p. 53).

[5] Bellamy finally asked Watterson what his function was after Wray resigned and
Bellamy was made interim Chief.  Watterson responded that he conducted tasks that
Wray gave to him, and declined to offer specifics. (**Exhibit O** pp. 26-28).

[6] Wray's exclusion of black command staff from real decision-making extended through
the duration of his administration.  For example,Wray did not invite Tim Bellamy, a
black Assistant Chief under Wray (**Exhibit B** p. 232) to what Wray acknowledged was a
"very important meeting" (**Exhibit J** p. 15) held at Wray's home in July 2005 in which
"everything involving James Hinson" was discussed (**Exhibit J** p. 10).  The 7-8 hour
meeting (**Exhibit J** p. 15) was for the purpose of preparing a press release in conjunction
with Wray's placing James Hinson on administrative leave.  Only white GPD employees,
including non-sworn officer Watterson, were invited, despite the fact that Assistant Chief
Bellamy was James Hinson's Bureau Chief . (**Exhibit J** p. 9).  Wray testified at
deposition that Bellamy "was not invited because I wanted to get a comfort level that the
action I was considering was appropriate." (**Exhibit J** p. 7).

-5-

C.    **The Wray Administration Engaged in Biased, Unreasonable, and
Unlawful Investigations of Black Officers.**

1.    **Overview of Investigations.**

Defendants Wray and Brady[7] tasked Defendant Sanders, who was merely one rank

higher than a new recruit, to take the lead on secret investigations of numerous black

officers, including command-level officers, often with respect to the most implausible of

allegations. Throughout Wray's tenure as Chief, allegations of impropriety by black

officers—even those made by drug users and criminal suspects who were obviously

lacking in credibility—were usually referred to Sanders for investigation. And

investigate them Sanders did—with a zealousness that one might expect to be directed to

the worst of criminals, not at GPD officers who had devoted their entire careers to law

enforcement; and in most cases long after it became manifestly apparent that there was no

basis whatsoever to the allegations; and only because of the color of the officer's skin.

When Sanders and/or other officers were given, on a handful of occasions, the task of

investigating white officers, their focus was completely different—to exonerate the white

officer quickly and quietly, even in the face of compelling evidence of misconduct.

Sanders' investigations of black officers consumed virtually all of his duty time

during the entire 2½ year period that Wray was Chief of Police. Defendants Wray and

Brady authorized Sanders to bypass his entire command staff and to report directly to

Deputy Chief Brady, and did not require him to prepare or to submit written reports of his

---

[7] In the opinion of Wray's Commander of Vice/Narcotics, "Brady can't wipe his butt if
Wray don't tell him to do it." (**Exhibit K** pp. 58-59; **Exhibit L** page 4645).

-6-

investigations of black officers, thereby eliminating any chain-of-command accountability for Sanders' investigations. Wray and Brady ensured that Sanders had all the manpower, equipment, and support he asked for, to the detriment of legitimate investigations. Brady at one time boasted that he would sacrifice a homicide to "get" a particular black lieutenant who had been promoted by Chief White. Supervisors who questioned the use of their resources in Sanders' investigations received stern instructions from Brady to back off.

Sanders and the GPD officers that worked with him on these assignments showed photographs of black officers, in lineup form or individually, to criminals, drug users, and others, in an effort to ascertain whether the officers were involved in any wrongdoing, often without any reasonable suspicion of unlawful conduct. Sanders and his team used a barrage of tactics to investigate black officers, including physical surveillance, trackers on vehicles, key-catchers on computers, telephone eavesdropping, telephone records, entrapment, and inquiries to criminal suspects. Wray permitted Sanders to continue with his investigations of black officers even after being admonished by an SBI agent, who had observed Sanders' tactics, that Sanders was overzealous in his investigations of black officers.

Wray, Brady, and Sanders even sought to prosecute their fellow police officers, all black, for matters ranging from justified uses of force to issues as trivial as forgetting to fill out holiday time slips; the District Attorney, for the most part declined to prosecute. When it was all said and done—from the day Wray became Chief until he was forced out of office due to the racially hostile environment he had created—the thousands of hours

-7-

of officer time spent on investigating black GPD employees yielded a single

determination of criminal misconduct—a misdemeanor, which resulted from Sanders'

informant soliciting a non-sworn black employee to commit the "crime."

The reign of terror directed to black officers in the 2½ years of the Wray

administration cannot be adequately described here,[8] especially given (1) the frenzied

pace of this litigation over the past several months,[9] and (2) Plaintiffs' abbreviated three-

week response period to the four sets of summary judgment briefs filed by defendants,

necessitated by the parties' inability to complete discovery within the original time

frames and the impending trial date.  Accordingly, the racially motivated actions

described below are intended to be illustrative, but by no means exhaustive.

    2.    **Investigations of Officers by SID Violated GPD Directives.**

Under the administration prior to Wray's, a criminal investigation of a GPD

officer would be assigned to a Special Investigation Response Team ("SIRT"), which

team would include detectives that specialized in the particular crime under investigation.

(**Exhibit P** p. 17; **Exhibit Q** p. 38).  The Sergeant with responsibility over SIRT from

2001 until Wray disbanded the program in 2004 was Craig McMinn. (**Exhibit P** pp. 9,

17-18).  SIRT investigations were conducted similarly to other types of criminal

investigations, including the generating and filing of reports. (*Id.* pp. 18-19).  The

---

[8] Plaintiffs refer the Court to their Interrogatory responses in **Exhibit A** hereto, which provide examples of each Plaintiffs' experience of the racially hostile environment at GPD.

[9] As the City notes (City's M.S.J. Brief p. 1), almost 60 depositions have been taken in this case and 40,000 pages of documents produced by Defendants.

-8-

primary difference between investigators' reporting in SIRT cases and other types of

criminal investigations was that SIRT documents were filed electronically in the GPD

system in a way that restricted the access of other GPD officers to them. (**Exhibit P** p.

20). McMinn was aware of no issues with the effectiveness of restrictions on access with

respect to SIRT matters. (**Exhibit P** pp. 20-22).

 When McMinn became Sergeant with supervisory responsibility for the SIRT

teams, there were about 14 detectives who were authorized to perform SIRT

investigations. (*Id.* p. 22). McMinn presided over approximately 22 officer investigations

while Sergeant over SIRT, not including allegations that were clearly frivolous. (*Id.* p.

29). Officers under investigation were, in most or all SIRT cases, notified of the

investigation.[10] (*Id.* p. 49). Each SIRT case (other than one arising from frivolous

allegations) "was documented and presented to the DA." (*Id.* p. 28). More particularly,

upon the completion of a criminal investigation of an officer, representatives of the SIRT

team, along with McMinn, hand-carried 30-50 page binders of reports to the District

Attorney's office and typically made a presentation to A.D.A. Howard Neumann. (*Id.* p.

47). All full-fledged SIRT investigations were presented to the D.A., even if the SIRT

team had concluded the allegation was unfounded. (*Id..* p. 48). This procedure ensured

(1) uniformity in officer investigations, (2) that the D.A.'s office provided an opinion as

---

[10] Contrast this with the covert SID investigations of black GPD officers, in which officers surmised they were under investigation only when they observed other officers surveilling them. (**Exhibit A** pp. 36, 47). Indeed, even when Assistant Chief Bellamy asked Wray several times privately about the rumors of SID's surveillance and investigations of black officers, Wray denied that any such investigations were taking place. (**Exhibit O** p. 72).

-9-

to whether there was probable cause for a prosecution, and (3) an additional layer of oversight over GPD investigations of its own. (**Exhibit P** pp. 44-45). All of this was thrown out the window when it came to SID's investigations of GPD officers, as discussed below.

Wray decided to eliminate the SIRT program and to assign criminal investigations of police officers to GPD's Criminal Investigation Division ("CID"). He accomplished this by Directive 7.1.6, implemented Spring 2004 (*see* **Exhibit J** pp. 203-05), which mandates that all criminal investigations of GPD officers are to be performed by the Criminal Investigation Division. *See* **Exhibit P** p. 24 (former SID Sergeant McMinn testifies that under Wray's Directives, allegations that an officer was engaged in criminal misconduct would be referred to Commander of CID, who would decide which detectives would work the case). When CID Commander Hastings challenged Wray on the officer investigations being performed by SID, Wray retorted, "I am the policy. Actually, I am the policy." (**Exhibit M** p. 124). Wray, when questioned at deposition about the language of Directive 7.1.6, testified that the Directive "should not read that way but it does." *See* **Exhibit J** p. 205. *See also Id.* p 162 (Wray testified that he considered GPD Directives relating to assignments of officer investigations to be fluid and subject to change at his discretion). During Wray's tenure as Chief, Defendant Sanders was a Special Intelligence Division ("SID") detective. As such he had no authority under the GPD Directives to investigate police officers.

At all relevant times, it was GPD's policy that an allegation of criminal misconduct against a GPD officer was to be reported immediately to Internal Affairs.

-10-

(**Exhibit Q** pp. 41-42; **Exhibit P** p. 43). Further, I.A. was to be "privy to all information

generated from a criminal investigation." (**Exhibit Q** p. 43). I.A. "shadowed" criminal

investigations of officers for several reasons. First, any evidence gathered in the criminal

investigation could be used in an administrative investigation. (*Id.* p. 43). Second, I.A.

was in a position to provide guidance to the criminal investigators, including guidance as

to whether the investigation was being done appropriately. (*Id.* pp. 45-46).

     3.    <u>Examples of Racially Targeted Investigations.</u>

Some examples of investigations that targeted black GPD officers,[11] as well as

examples of similar conduct by white officers that were treated much differently by the

Wray administration, follow.

     a.    <u>Stacy Morton</u>

In 2003 Plaintiff Morton (black) was assigned to the Crime Abatement Team, at

the time one of the elite groups in GPD. The CAT team was responsible for street-level

crimes, including drugs, burglaries, crimes in progress. CAT officers were in plain

clothes and often monitored trouble spots within the city limits. **Exhibit A** p. 50.

On or about August 26, 2003, Morton and his partner, GPD officer Linstad,

observed in front of a known crack house a pickup truck that matched the description of a

vehicle that had been involved in a robbery. Morton followed the vehicle, advised

dispatch that he believed he might have located the suspects, and turned on his blue

---

[11] Richard Ball, Commander of Vice/Narcotics under Wray, perceived that black GPD
officers were singled out by the Wray administration because of their race. Ball said that
Wray put black officers into certain positions merely as "tokens." This "manipulation"
under Wray explained why "a number of people are upset." (**Exhibit K** p. 84).

Case 1:09-cv-00934-TDS-JEP   Document 198   Filed 09/27/13   Page 11 of 45

lights. The truck pulled over. Linstad walked to driver's side. Morton walked to the

passenger's side. The driver, who was an extremely large man (**Exhibit B** p. 36), was

irate, screaming, "Why you stopping me?," etc. Linstad asked the driver to exit. Morton

asked the passenger closest to him to step out. Morton observed what he believed to be

crack cocaine on floor of passenger seat. **Exhibit A** p. 50.

Morton handcuffed the passenger. Linstad started handcuffing the driver. The

driver became even more irate. Two other officers, A.B. Edwards and S.P. Richardson,

appeared at the scene, and assisted with the middle passenger, handcuffed him. The

driver was yelling and screaming, pulling away from Linstad, jerking. Morton told the

passenger he had handcuffed to sit on ground and went around to assist Linstad. Morton

addressed the driver in a loud voice to match the volume of the suspect's voice. The

suspect was kicking and pulling away from Linstad, lunging at Morton. *Id.*

Morton took palm and pushed the man away from him, a defensive tactic that

GPD officers were taught in training to force a violent suspect away from them. As they

took the suspects to jail, Morton called his supervisor, Sgt. Wolfe (now Capt. Wolfe), and

described what had happened. Wolfe instructed Morton to write a report, and that Wolfe

would write it up as use-of-force report. The only reason the GPD command staff

became aware of the use-of-force incident is that Morton had reported it to his sergeant,

as GPD Directives required. *Id.* p. 51.

On or about August 29, 2003, Morton was called into the Internal Affairs Office.

Sgt. Crotts told Morton he was suspended, stating, "You struck a handcuffed prisoner

within the custody and safety of GPD," or words to that effect. Crotts gave Morton a

-12-

document signed by Wray confirming that Morton had been suspended. Before this, Morton had never had any disciplinary issues at GPD. (*Id.*)

Six weeks later, on or about October 13, 2003, Morton was called in to GPD and given a document showing that termination of his employment was being recommended. Morton had to sign a memo the next day showing that he was accused, on an administrative level, of violating Directive 1.5.2 – conduct toward public and employees, 1.5.4., obedience to laws and regulations. This memo was signed by Captain D.K. Crotts, "Commanding Officer, Special Investigations Division." Never in at least the previous 20 years of GPD history (or since) was an officer terminated for violating these directives. (*Id.*).

A hearing before the Board took place on November 11, 2003. The suspect did not show up. SID officer Edwards even went to the suspect's house to try to find him, not the usual practice. The vote was 5-0 in favor of Morton coming back to work (Wray did not vote). By directives, the Chief usually defers to the Board's determination. He did not in this case. Captain Anita Stalls prepared a recommendation dated October 13, 2003, stating, "After conferring with command staff members on my earlier recommendation for a lesser degree of disciplinary action, termination is recommended." Assistant Chief Bellamy and Defendant Wray signed their concurrence. Bellamy later told Morton that Stalls and Bellamy had no choice but to concur with Wray. On October 16, 2003, Wray sent Morton a memo notifying him that he was being suspended without pay. (*Id.*).

-13-

Meanwhile, after a criminal investigation by SID officer Edwards, Morton was also being criminally prosecuted for assault. The court date was January 28, 2004. The alleged victim appeared this time. After a bench trial, Morton was found not guilty. (*Id.*).

Back on the administrative side, Morton appealed Wray's decision to terminate him to the City Manager. In his regular one-on-one monthly meetings with then-Deputy City Manager Johnson in 2003, Wray had briefed Johnson on the Stacy Morton case. Wray told Johnson that Morton got involved in a verbal altercation with someone who was being arrested; that Morton had lost control of himself; the man was being held by two officers, handcuffed, and Morton hit him in the mouth with a closed fist. "In other words, just took a pure shot at the guy which would be extremely inappropriate." Based on Wray's description, Johnson had believed that termination of Morton was "an entirely appropriate decision." (**Exhibit B** p. 30).

As Deputy City Manager, Johnson had responsibility over all appeals of GPD disciplinary actions. With only one exception while in this role, Johnson reviewed all such appeals based upon documentary evidence alone. The exception was the Stacy Morton appeal. (**Exhibit B** p. 24). Johnson called for a hearing in the Morton matter because he "had concerns about the information that was being presented to me and I also wanted to hear directly from Mr. Morton, his view of the events." (*Id.*).

Johnson's concerns arose from the documents he received, as well as concerns expressed by officers in the process. Those officers advised Johnson that "Chief Wray chose to direct officers below him to change their recommendation to fit his desired outcome." (*Id.* p. 25). Captain Anita Holder, one of the officers that discussed the matter

-14-

with Johnson, advised Johnson that Wray had instructed her to change Morton's punishment from demotion and suspension with pay to termination; Holder had followed Wray's order. (*Id.* pp. 27-28).

Based on the evidence presented at the Morton hearing, Johnson was persuaded that the version of events presented to him by Wray was incorrect. (*Id.* pp. 33, 230). Johnson did not really have concerns about Wray's credibility due to this situation. "I felt that Chief Wray was trying to take a strong stand on officers' behavior and at that time, at that specific time I felt personally that he had overemphasized the event." (*Id.* p. 34).

On February 27, 2004, the City Manager's office reinstated Morton. (**Exhibit** A p. 51). The discipline to be imposed on Morton was within the Chief's discretion. (**Exhibit B** p. 228). Morton had to acknowledge that he had violated the directives in order to come back, received a reduction in rank, was suspended without pay 160 hours; and received a departmental reprimand. Wray removed Morton from the C.A.T. team and placed Morton on patrol in the part of the city that no one likes to work. (*Id.*).

### b.    Darrin Davis

In about 2003, Plaintiff Davis (black) and Officer Fulk (white female) responded to a domestic call. The suspect, Jeffrey Michael Ayers, was shouting the N word at Davis, "F you, you want to come back and F my girlfriend", etc. Davis saw no sign of physical abuse on Mr. Ayers' girlfriend, but he had a warrant for arrest. Davis and Fulk handcuffed him. Walking back to the car, Mr. Ayers continued to curse and jerk. As he was trying to put him in car and the man continued to struggle, Davis put his hand on his

-15-

neck. He was still kicking—kicked Davis' name plate off. At some point, the suspect hit his head on the car. **Exhibit A** p. 24.

When they returned GPD, Tim Saddler (white officer) asked Davis why his name tag was hanging off. Davis told Saddler, "I had to choke some MF out" our words to that effect. Saddler reported the incident, and an Internal Affairs investigation started. Ayers himself never complained. I.A. turned it over to Davis' Sergeant, Faircloth—during this time sergeants investigated use of force issues. Faircloth wrote it up, recommended and implemented a first level reprimand. That was the end of administrative part. (*Id.* p. 25).

Eight to nine months later, in November 2003, anonymous letter was sent to the Guilford County District Attorney. The letter said Davis choked Mr. Ayers unconscious, and that the assisting officer, Fulk, had reported the incident but was "rebuffed." Chief Wray then opened a criminal investigation on the matter, in violation of GPD Directive 7.1.6, which then provided that a criminal investigations must be done "prior to or concurrent with" administrative investigation. Detective Mary Sexton (homicide investigator) led the GPD investigation. The D.A. subsequently determined there was no basis for criminal charges. Afterwards, Wray told Davis that "they were saying that your incident was the same as Stacy Morton's." Wray told Davis he decided, "Let's open it and let the chips fall where they may." (*Id.* p. 25).

### c.    Joseph Pryor

After Wray replaced I.A. Commander Crotts with Matt Lojko, one of the officers in Wray's inner circle, Lojko initiated a criminal investigation against Plaintiff Pryor (black) in a matter that had previously been administratively investigated and closed.

-16-

Plaintiff Pryor was involved in an incident that occurred at a Greensboro Harris-Teeter in about late 2005, while Wray was Chief. Pryor was working off-duty. A man entered the store, walked up to Pryor and said, "This is a stickup." Then he said, "I'm just playing," and wandered off. A few minutes later the man went through checkup line, and came past Pryor again. Pryor told him, "You shouldn't joke like that, you could be arrested." He said, "I know, I don't care," or words to that effect. Pryor was concerned that guy might doing a test run for an actual robbery, and told the man that he was under arrest for public disorder. Pryor secured the man's wrist to place him under arrest. The man swung at Pryor and tried to exit the store while Pryor had his wrist. Pryor tried to subdue the man for several minutes before other units arrived to assist him. (**Exhibit A** p. 57).

Pryor took the suspect downtown, where the Magistrate determined that there was probable cause for an arrest. A couple of days later, Pryor was advised that GPD had dismissed the charges because they didn't feel that the charges would hold up in court. (*Id.*).

Any use of force required investigation and, at the time, the responsibility for the investigation fell on the officer's Sergeant. This administrative investigation concluded that Pryor did not have probable cause to arrest the suspect. Pryor's Captain, Plaintiff Phifer, recommended a first-level reprimand (which remains active for six months), an outcome with which Captain Crotts—who was in the process of being supplanted from the position of I.A. Commander by Wray's inner-circle confidante, Lojko—concurred. (*Id.*).

-17-

When Lojko became Captain of I.A., he ordered a criminal investigation of Pryor. (**Exhibit A** p. 55; **Exhibit O** pp. 60-61). Sergeant Buser then called Pryor to the office and advised him that he was going to be criminally charged for assaulting the suspect, and instructed him to report to C.I.D. the next morning. Pryor called Bill Hill, the police union attorney, who told him they probably were going to arrest him, to be prepared to surrender his badge and gun.

Phifer and Assistant Chief Bellamy intervened on behalf of Pryor and advised Wray that it was against policy to open a criminal investigation after an administrative investigation had been completed and discipline administered. Wray relented, but the criminal investigation was dropped only after Pryor's discipline was increased to a divisional reprimand (active for one year). (**Exhibit A** p. 55). Pryor did not appeal the decision; he had gone from having to turn in his badge to a Division Level Reprimand, and decided to take his lumps. (*Id.* p. 57).

Pryor is familiar with no other situation in which a Magistrate found probable cause, then the officer was investigated and disciplined for improper discretion in determining that there was probable cause in making the arrest. (*Id.* p. 57). Pryor's situation is another example of the policy and practice of the Defendants during Wray's tenure of initiating or attempting to initiate criminal proceedings against black GPD officers whenever the opportunity arose.

    d. 

both white, tackled and arrested a person walking through their neighborhood while they

-18-

were off duty. (**Exhibit M** p. 77).  The Magistrate found no probable cause for this arrest.

An arson detective within CID reported to CID Commander Hastings that he believed the

arrest was improper. (*Id.* pp. 74-75).  After consultation with the D.A.'s office, CID

initiated a criminal investigation of ███████ for assault and false arrest.  At the very

early stages of this investigation, Wray called Hastings, angry, and directed Hastings to

shut down the criminal investigation. (*Id.* p. 75).  Wray said the matter was being turned

over to I.A. (*Id.* pp. 77-78), Hastings heard nothing else about the matter after this. (*Id.* p.

77).

        e.    ███████████

In 2003, before Wray was Chief, ██████████ (white), ████████████████

████████████████.  Heard at the time was a Sergeant.  A homeless guy had

been arrested; Heard saw the man before he was transported to jail.  Several hours later,

████ telephoned Heard and told him that the jailers would not process the suspect

because he was high on drugs.  Heard later learned that this statement was false, and that

the suspect was not processed because he was in need of medical attention for physical

injuries.  When Heard went to the emergency room that night to discuss the matter

directly with ██████, he saw that the suspect's face had been badly beaten.  ██████ had

not advised Heard of any use of force in their earlier conversation, as he should have

done. (**Exhibit A** pp. 31-32).

    It was later revealed that after ██████ had performed several strip searches on the

suspect, he summoned two other GPD officers.  ██████ asked his trainee to stay in the

booking room while ██████ and the two other officers escorted the man to the bathroom.

-19-

While in the bathroom, there was a struggle and the suspect was injured, and drug paraphernalia allegedly found on his person.  Moreover, at some point, the man's watch was taken by the trainee. (*Id.* p. 32).

Heard then wrote up ██████ and the matter was turned over to Internal Affairs. However, for reasons unknown, it appears that Brady, in his capacity of Captain over S.I.D., took control of the investigation.  A hearing notice copied to Heard dated March 3, 2003, was signed by Brady in his capacity as Captain over S.I.D. ██████, to the best of Heard's knowledge, was not prosecuted and received no meaningful administrative discipline, although a truthfulness violation was an offense justifying termination from employment. (*Id.*)

Wray testified that as Assistant Chief in ██████ chain of command, he supported I.A.'s recommendation of termination of ██████ However, according to Wray, "Apparently ██████ asked for some kind of appeal in that process and I guess it was granted because the decision was made not to terminate him." (**Exhibit J** p. 270).

In a truly disgraceful turn of events, as a result of these incidents, Wray, newly minted as Chief, transferred *Heard* to District 3, considered by many to be the least desirable district within GPD's jurisdiction.  Wray told Heard, "You need a new start because of this incident." (**Exhibit A** p. 32).  Wray testified that he ordered this transfer:

> for good order and discipline on that squad. From time to time things happen. I supported Charlie's rec -- strong recommendation that ██████ be terminated and I supported that, but Charlie was very upset if I recall about the outcome of this and I felt like that it would be better for everybody to do a transfer. I could have moved three or four officers or I could have moved the sergeant and I moved the sergeant. It wasn't a disciplinary move.

-20-

It was just a move that was in the best interests of the organization and I
think ultimately in Charlie's best interest.

(**Exhibit J** p. 270). Wray may have believed it was in "the best interests of the

organization" to transfer Heard, but due to this and other events in Wray's administration,

Heard has struggled ever since to maintain his inner peace. [12] (**Exhibit A** p. 32).

Wray brought to Johnson's attention, in his monthly one-on-one briefings with

Johnson, the use of force by a GPD officer on a prisoner in a holding cell. (Johnson Dep.

pp. 37-38). Despite Johnson's testimony with respect to the Morton situation that the use

of force against a restrained suspect or prisoner "is an extremely serious situation and a

situation that would justify termination" (*Id.* p. 35), he did not attempt to gather more

information on the ███████ incident.

        f.    **James Hinson**

James Hinson (black, no relation to Plaintiff Antuan Hinson) is not a Plaintiff in

the *Alexander* actions but, because (1) he was a high-ranking black officer under Wray,

and (2) the Department's targeting of him during the Wray administration was so

egregious and so well-publicized and created so much apprehension among the Plaintiffs

herein, his circumstances merit in-depth discussion here.

---

[12] *Accord* Affidavit of Plaintiff Hunter, attached to his Appendix, ¶ 4 ("Wray and Brady
on a whim could change any officer's duty assignment, thus disrupting family life which
many had worked hard to maintain on their present work schedule. A great fear was that
even if you won an appeal of evaluation of some unfair discipline you could still be
transferred and suddenly have to make new child care arrangements, reschedule
appointments made months in advance, stop all education endeavors, etc."

Wray made it clear that he did not think White should have promoted James Hinson, a black GPD officer who became a target of criminal investigations during the entire Wray administration, to Lieutenant. **Exhibit A**, p.37.

In their monthly face-to-face meetings, Wray advised then-Deputy City Manager Johnson that GPD was investigating James Hinson with respect issues of immediate interest brought to GPD by federal agencies. (**Exhibit B** p. 119). Wray gave then-City Manager Ed Kitchen and Johnson the impression "that there was a very, very serious, federal, big issue with Mr. Hinson involving drugs, drug dealing . . . and that he was, in essence, up to his eyeballs in it, and so he got full approval from the manager and myself to take any actions he deemed necessary as chief to do the appropriate thing." (*Id.* p. 121). Wray said that the federal investigation was ongoing and that he had been directed not to take any action with respect to Hinson because it would tip off other investigations. (*Id.*). In retrospect, Johnson testified that these representations were "not accurate at all." (*Id.* p. 20).

In 2003, shortly after Crotts became Commander over Internal Affairs, Sanders and Bissett gave a debriefing to him and Brady, in Brady's office, regarding their criminal investigation of James Hinson. (**Exhibit Q** p. 49). Sanders and Bissett had investigated Hinson's alleged involvement in an assault and prostitution at his bachelor's party—as well as his connection to a drug dealer, ▆▆▆▆▆▆▆▆, in light of their claim that Hinson's number had been found in ▆▆▆▆▆▆ safe. (**Exhibit Q** pp. 49-50, 54). Sanders and Bissett advised that the criminal investigation had reached a dead end, that

-22-

there would be no criminal charges, and that they were turning the matter over to Internal Affairs to conduct an administrative investigation. (**Exhibit Q** p. 50).

Sanders and Bissett had not disclosed to I.A. that they were conducting a criminal investigation of Hinson, as GPD procedures required, and, as a result, I.A. had not monitored the criminal investigation. (*Id.* pp. 50-51). Moreover, Sanders and Bissett had reported to Brady during the course of this investigation, despite the fact that Brady was not in their chain of command at that time. (*Id.* pp. 56-58). Sanders and Bissett provided no explanation in their briefing to Crotts and Brady as to these irregularities, and Crotts did not question them on these subjects. (*Id.* pp. 50-51).

Internal Affairs then carried out an administrative investigation of James Hinson with respect to Sanders' and Bissett's allegations of prostitution, assault, and association with a drug dealer. (*Id.* pp. 51-52). In that investigation, I.A. determined that the witnesses that Sanders and Bissett relied upon for their information were not credible. (*Id.* pp. 52, 66). ███████, the drug dealer that Sanders and Bissett suspected that Hinson was involved with, stated no GPD officer, including Hinson, had any connection with his drug operation, notwithstanding the fact that he was being offered substantial assistance if he would provide such information. (*Id.* p. 67). I.A.'s investigation, moreover, produced no information corroborating that Hinson's number had been found in ███████ safe. (*Id.* pp. 54-55). Based on I.A.'s investigation of these issues, it determined that there was no need even to bring Hinson in for questioning on any of these subjects. (*Id.* p. 68). I.A. advised Brady of its determination, and its weekly briefings to Brady on the subject of Hinson ceased. (*Id.* p. 72).

-23-

In Summer 2005, after James Hinson found the tracker on his vehicle and GPD placed him on administrative leave, Wray arranged to hire back two unsworn retired GPD officers, Thacker and Wyrick, to investigate numerous allegations against Hinson. Dwight Crotts, who, without explanation from Wray (**Exhibit Q** p. 85), was being ousted as I.A. Commander and replaced by Matt Lojko, objected in a meeting with Wray and Lojko that these unsworn officers lacked authority to investigate Hinson without violating State law and GPD Directives. (*Id.* pp. 75-76, 82). Wray answered that he could order parking enforcement to do an investigation if he wished. (*Id.* p. 85). Lojko added that he lacked confidence in the I.A. officers' ability to handle the investigation due to its complexity. (*Id.* pp. 82-83). Crotts disagreed with Lojko's assessment. (*Id.* p. 84).

Thacker and Wyrick advised Crotts that among other issues involving Hinson, they had been instructed to investigate allegations against him relating to prostitution and/or assault at his bachelor's party and his association with Turnbull. (*Id.* p. 77). Crotts told them that I.A. had already investigated these issues and determined they were unfounded, and advised them where they could find a memorandum to that effect. (*Id.* p. 77-79). In his career, Crotts had never heard of an administrative investigation being reopened after it was closed in the absence of new relevant information. (*Id.* p. 88).

g. **Fulmore**

Julius Fulmore (black) is not a Plaintiff in this action. However, as was the case with James Hinson GPD's pursuit of James Hinson, SID's serial investigations of Fulmore were a topic of great concern to many Plaintiffs herein. Fulmore is filing today

-24-

his own response to the City's motion for summary judgment in *Fulmore v. City*,

1:09cv373.  Plaintiffs incorporate by reference the facts and supporting evidence set forth

in that response brief.  Plaintiffs point out, in addition, that Wray's and Brady's

assignment of Sanders and Bissett (*see* **Exhibit M** p. 17), who had a decade-old history

of animosity towards Fulmore (*see* **Exhibit P** pp. 51-52), to investigate Fulmore speaks

volumes about their mentality, and may explain the euphemistically described

"irregularities" in their investigation of Fulmore. (**Exhibit Q** p. 158; *see* **Exhibit Q** pp.

158-62; **Exhibit S** pp. 18-19; **Exhibit P** pp. 52, 75)

> **h.** ▇▇▇▇▇▇▇▇▇

Information came to I.A. Commander Crotts from Sanders and Bissett that non-

sworn black GPD employee ▇▇▇▇▇▇▇▇ (black) was paying for sex at a Greensboro

strip club. (**Exhibit Q** pp. 61, 139, 142).  Sanders and Bissett indicated that Crotts that

▇▇▇▇▇ was part of a group of black GPD employees that regularly paid for sex at the

club. (*Id.* p. 140; **Exhibit S** pp. 27-28).  They said that ▇▇▇▇▇ was the weak link among

these black officers and that he was picked up he would "crack." (**Exhibit Q** p. 141;

**Exhibit S** p. 28).  With the approval of Crotts, Sanders and Bissett arranged for ▇▇▇▇

▇▇▇▇ to solicit ▇▇▇▇, and he agreed to pay money for sex.  However, when Crotts

spoke with ▇▇▇▇ at the scene, he learned that ▇▇▇▇ had no knowledge that

▇▇▇▇ worked at GPD, and that his prostitution activities took place at his home in

private, without involvement or knowledge of other GPD employees. (**Exhibit S** p. 28).

Crotts said this was an example of a pattern in Sanders' investigations that "if the

-25-

evidence is supporting . . . the theory, then . . . that's what's presented." (**Exhibit Q** p. 144)

█████was subsequently investigated by I.A. and was either terminated or resigned before he could be terminated. (**Exhibit Q** pp. 60-63).

          **i.**      ████████

GPD Officer ████████ (white, *see* **Exhibit O** p. 49 lines 13-14), was investigated for ███ connections to a suspected dealer of cocaine, who had a criminal history and was allegedly selling drugs from a Greensboro bar. (**Exhibit O** pp. 48-49). Undercover officers had made controlled buys from the dealer at this location. (**Exhibit O** p. 48). They observed the dealer and ████████ together during surveillance. (**Exhibit J** p. 143; **Exhibit O** dep. p. 40).

I.A. Commander Crotts learned after the fact that allegations of a criminal nature against ████████ were being investigated (**Exhibit Q** p. 93)—again, in violation of GPD procedures requiring immediate notice to I.A. of allegations of a crime by a GPD officer. Sanders and/or Bissett advised Crotts that an undercover Winston-Salem police officer had been brought in to observe ████████ at the bar, but that this officer reported that "nothing happened." (*Id.* p. 96). Crotts did not know whether ████████ was even in the bar at the time of this one-time surveillance. (*Id.* p. 96). He was not advised in this briefing that informants had provided information that ████████ (1) was involved with taking money for the drug dealer; (2) alerted the drug dealer that vice narcotics officers had been in the bar; and (3) may have been romantically involved with the drug dealer. (*Id.* pp. 96, 98). Rather, Crotts was led to believe that the investigation

-26-

Case 1:09-cv-00934-TDS-JEP   Document 198   Filed 09/27/13   Page 26 of 45

was merely of ███████ association with the drug dealer, and not a criminal

investigation of whether she was herself involved in the distribution drugs. (*Id.* p. 96).

Indeed, based on the briefing he received, Crotts was under the impression that there was

not even an association between ████████ and the drug dealer. (*Id.* p. 96 lines 19-22;

p. 97 lines 15-20).

     After this briefing, Crotts called ███████ in to counsel ██ to be careful of

appearances. (*Id.* p. 97). Crotts does not know whether he kept a record of this

communication. (*Id.* p. 98). Crotts' normal practice after such a counseling session

would be to verbally report it to his direct report, Brady. (*Id.* pp. 98-99).

     **j.**     ███████

     The SBI notified I.A. Commander Lojko in 2005 that the brother of GPD Officer

████████ (white) was suspected of selling cocaine out of the home of Officer █████.

Subsequently, SBI confirmed that ██████ brother had sold cocaine in a controlled buy

to law enforcement and had been arrested. Lojko called Officer █████ and advised him

that he knew that █████was not involved and asked him whether he wanted the memo

relating to the SBI's original contact with GPD deleted from the file. (*See* **Exhibit T**).

Wray, while Chief, knew that ██████ brother was arrested for dealing drugs out of

██████ home. (Wray p. 50).

     **k.**     ███████

     When former GPD officer███████ (described as "biracial," *see* Hastings p.

67) was accused of stealing gasoline from the City in 2005, ██████ denied the allegation

and asked GPD to administer a polygraph to him. Wray's Assistant Chief, Craig Hartley

-27-

quashed I.A. Sergeant Thomas' request for a polygraph of ▮▮▮▮ on the ground that

polygraphing GPD officers would make it look like GPD considered them to be liars[13]

(**Exhibit Q** p. 147)—despite the fact that ▮▮▮▮ was requesting a polygraph, and even

when I.A. Commander Crotts asked Hartley to reconsider this decision. (*Id.* pp. 146-47).

I.A. Corporal Davis, the lead investigator, determined that the allegations against ▮▮▮▮

should not be sustained.  Captain Crotts advised Wray of Davis' determination, and

Wray, according to Crotts, exhibited "disgust." (*Id.* p. 153).  Based on Wray's reaction,

Crotts believed that unless there was a finding that ▮▮▮▮ had stolen the gasoline, Wray

would direct "animosity" towards the I.A. Sergeant and Davis, and would transfer Crotts,

Thomas, and/or Davis out of I.A. (*Id.* pp. 151-52; **Exhibit S** p. 14]).

    4.   **Admonitions to Wray About SID's Investigations Go Unheeded.**

      SBI Agent James Bowman had worked with Fulmore in about the year 2000 on a

task force which investigated an alleged multi-kilo-level drug trafficking operation.

(Bowman Affidavit, **Exhibit U**, ¶ 3).  During Bowman's work with Fulmore, he was

impressed with Fulmore's work habits, honesty, and handling of informants. (*Id.* ¶ 4).

Subsequently, in late 2003, Bowman was assigned to investigate a Guilford County jail

inmate's allegations of criminal activity involving Detective Fulmore.  SBI made a

---

[13] Contrast GPD's investigation  of Julius Fulmore (black), in which the Wray
administration for 10 months tried, unsuccessfully, to find some evidence that Fulmore
had engaged in prostitution and drug use. (**Exhibit V** pp. 33-37).  Fulmore was
polygraphed twice, once in the criminal investigation, once in the administrative
investigation. (*Id.* pp. 29-30).

-28-

courtesy notification to GPD of this investigation, and GPD assigned Sanders[14] to work with Bowman and the Guilford County Sheriff's Department on the investigation. (*Id.* ¶ 7).

After what Bowman considered to be a thorough investigation of the issue, he came to a clear conclusion that the inmate was not credible and that there was no substance to the allegations, and closed the SBI's case. (*Id.* ¶ 11). Bowman at that time addressed with Officer Sanders his conclusion that there was a lack of credible evidence relating to the inmate's claims. Sanders, however, expressed a belief that there was, in fact, merit to the inmate's allegations and stated that he wanted to place a tracking device on Fulmore's vehicle to monitor his activities. (*Id.* ¶ 12). Bowman declined to participate. (*Id.* ¶ 13). Bowman later reviewed a memorandum prepared by Sanders that was misleading and wrongly suggested that Fulmore had compromised a federal drug investigation. (*Id.* ¶ 10).

In July 2004, after SBI had withdrawn from the investigation, Bowman approached Defendant Wray and advised him of his opinion that Sanders had exhibited "tunnel vision" in connection with the Fulmore investigation in that he seemed to be single-mindedly convinced, in the face of evidence to the contrary, that Fulmore was guilty of criminal conduct.[15] Wray did not appear to be concerned upon hearing Bowman's opinion. (*Id.* ¶ 13).

---

[14] As previously discussed, the assignment of Sanders, an SID detective, to a GPD officer investigation was in violation of GPD Directive 7.1.6.

[15] Wray did not advise his boss, City Manager Johnson, about this communication with Bowman. (**Exhibit B** p. 267).

-29-

Likewise, in Summer 2005, Plaintiff James, then Wray's Executive Officer, repeatedly talked to Wray about the activities of SID. James cautioned Wray that SID was doing some things that could get everybody in trouble. Wray tried to justify whatever they were doing. (**Exhibit A** p. 40).

### 5.    Efforts to Complain to City Manager Also Ineffective.

Numerous complaints were made to the City Manager's office about the racially hostile work environment at GPD. Until the SBI visited City Manager Johnson to discuss the issues, the complaints were essentially ignored.

Early in Wray's tenure, then-Deputy City Manager Johnson received anonymous letters from persons identifying themselves as GPD officers, expressing concerns about the treatment of black officers. In about early 2005, according to Johnson, "there started to be issues where officers claimed that people were not being treated appropriately." These issues came to Johnson's attention in "hallway conversations, things like that." However, Johnson testified, "[Q]uite frankly, I didn't pay a lot of attention to it." (**Exhibit B** pp. 48-49; 196).

The City Manager's received a letter in June 2005 (**Exhibit C**) from the NAACP with a list of questions about the treatment of black GPD officers, directed to the City Manager.[16] The issues raised by NAACP ranged from the exclusion of black command-level GPD officers from briefings and meaningful decisions, the use of SID to investigate black officers, and the use of photographic lineups of black officers in investigations.

---

[16] Ed Kitchen was the City Manager at this time. Wray testified that he met with Mr. Kitchen in this time frame to discuss whether black officers' complaints about being targeted were true. (**Exhibit J** p. 29 lines 1-12).

-30-

(*Id.*; *see* **Exhibit B** p. 75). Johnson asked for and received a written response from Wray, a copy of which is attached as **Exhibit D**. (**Exhibit B** p. 76). Wray's response asserted, for example, that details about particular investigations of GPD officers would be shared with his command staff if and when the investigation sufficiently "mature[d]." (*Id.* p. 80). Wray asserted, in response to NAACP's query, that SID had authority to investigate police officers (although Johnson learned afterwards that the GPD Directives did not provide SID with such authority). (*Id.* pp. 84-85). Wray also wrote that "GPD does not maintain a black book that contains information that is exclusive to any one class of employee, regardless of their ethnicity or gender." (*Id.* p. 86). With respect to NAACP's question about harsher discipline being administered to black officers, Wray promised to examine the issue further. (*Id.* pp. 82-83).

Johnson met with the President of NAACP's Greensboro Chapter, Gladys Shipman on July 19, 2005, and provided Ms. Shipman with verbal explanations to each of the issues raised by NAACP consistent with the written responses that had been provided to him by Wray. (**Exhibit B** pp. 77-78). Johnson parroted Wray's responses to the NAACP's concerns, advising Ms. Shipman,

> with every ounce of integrity that I have that we didn't have a black book, that we were not targeting black officers, . . . things that I . . . now know are not true, but I did it because I trusted the man that gave me that information.

(**Exhibit B** p. 78).

A number of mostly veteran black GPD officers, including Assistant Chief Bellamy, participated in meetings at churches and other locations in Summer 2005 to

-31-

discuss strategies for addressing the racially motivated corruption within the Department. A decision was made to send three representatives, Plaintiffs Graves, Hunter, and Wallace, to confront Wray and Johnson with their concerns.  (**Exhibit A** p. 30; **Exhibit O** pp. 137-39. 267-68).  A member of GPD's Command Staff warned Graves that if the meeting was not successful, the three officers would suffer the consequences themselves. (**Exhibit A** p. 30; *see also* **Exhibit O** pp. 167-68 (Assistant Chief Bellamy participated in meeting to prepare questions for Graves, Hunter, and Wallace  to bring to Chief Wray; Bellamy did not tell Wray that he was doing this; Bellamy acknowledged that by confronting Wray, Graves, Hunter and Wallace—but not Bellamy—were putting themselves on the line).

The meeting occurred in August 2005 at the City Manager's office. (**Exhibit B** p. 95).  The City Attorney, along with Wray and Johnson, were present.  Plaintiffs Graves, Hunter, and Wallace addressed their concerns including SID's investigations of black officers, disparate discipline, and exclusion of black officers from decision-making. (*E.g.*, **Exhibit B** p. 101).  After the meeting, Johnson asked Wray to review the concerns the officers expressed at the meeting "to make absolutely sure that there were no issues that were valid" (*Id.* p. 322), and to provide him with a report. (*Id.* p. 96).

Wray provided Johnson with a letter dated October 24, 2005 (**Exhibit E**), assuring him that the issues raised by the black officers had been investigated and that "in every case, the person charged with conducting the review found there was no impropriety on the part of the agency or any Departmental member involved in the administrative investigation." (*Id.*).

-32-

Attached to this letter were four memoranda from Wray's assistant chiefs. The two white assistant chiefs, Brady and Hartley, both in Wray's inner circle of white officers, addressed a total of 20 different issues which were at the heart of the black officers' concerns. The black assistant chiefs, Bellamy and Stevenson, addressed a total of five concerns, most of which were of little consequence to the black officers. In any event, Johnson apparently paid little attention, testifying that he did not know if the four memoranda were submitted to him by Wray. (**Exhibit B** p. 103).

Johnson started to become apprehensive about Wray's leadership—not as a result of the meeting with Graves, Hunter, and Wallace—but because a number of command-level officers that he "had known for a long time and respected" (*Id.* p. 107) met with him individually and expressed concerns about the "overall administrative behavior and issues and decisions" in the Wray administration. (*Id.* p. 105). Even then, Johnson had no intention of taking action until he was approached in Fall 2005 (*Id.* p. 129) by representatives of the SBI, who cautioned him about SID's handling of officer investigations. (*Id.*; **Exhibit B** pp. 266, 323-24). The SBI representatives, James Bowman and his supervisor, admonished Johnson that if SID continued its investigative activities GPD could find itself in trouble; stated that they did not feel Wray was taking any action to address these concerns, and explained that they felt it was their duty to make Johnson, as City Manager, aware of their concerns. (*Id.* pp. 106, 130).

The visit from the SBI representatives, Johnson testified, "was certainly something that got my attention," (*Id.* p. 130), and was the major impetus for him to order independent investigations of GPD. (*Id.*).

-33-

6.    **City Legal and RMA Investigations.**

Johnson asked the City Attorney's department to confirm that Wray's explanations

about the allegations made by black GPD officers were accurate and that GPD's actions

were justified. (**Exhibit B** p. 124). He asked City Legal to prepare a written summary of

its investigation and findings so he had something to consider. (**Exhibit B** p. 110).

Johnson testified:

> At the beginning of the process I believed that the primary goal of the
> outside investigators [was] to justify and explain the actions that had been
> explained to me by the chief and to clarify that, in fact, what was being told
> to me was appropriate and correct and that *I would have the ability to
> defend the chief against outside charges.*

(**Exhibit B** p. 112 (emphasis added)). *See also Id.* p. 152 (until time RMA retained,

Johnson believed that Wray "was doing the right things").

Soon after City Legal started its investigation, Johnson and City Legal decided to

involve a disinterested third party in the process. (*Id.* pp. 103-04). He ultimately selected

Risk Management Associates ("RMA) out of Raleigh to participate in the investigation.

Johnson determined that RMA was experienced and capable of performing an unbiased

review of GPD. (*Id.* p. 126). Originally RMA had a very broad focus, but its assignment

was eventually narrowed down to the issues relating to GPD's investigations of James

Hinson. (**Exhibit B** p. 118; **Exhibit G** p.1).

City Legal and RMA led scores of interviews of GPD officers and others. In the

course of these interviews, it was discovered that Brady had hidden the book with the

lineups of 19 officers in his trunk. Several officers who were in Wray's inner circle

resigned. ██████████████████████ and Brady, second-in-command under

-34-

Wray, resigned around Thanksgiving 2005. ▮▮▮▮▮ resigned in about the beginning of 2006. (**Exhibit B** p. 74).

The City's own legal department made damning findings about the racially hostile work environment under Wray. *See, e.g.*, **Exhibit F** p. 25 ("A pattern of targeting African-Americans appears to have developed under Chief Wray's administration").

Johnson received RMA's report on its investigation, a copy of which is attached hereto as **Exhibit G** (*see* **Exhibit B** pp. 117, 132) on about December 21, 2005. (**Exhibit B** p. 152). He received City Legal's report, a copy of which is attached hereto as **Exhibit F** (*see* **Exhibit B** p. 137). After reviewing the RMA document thoroughly (**Exhibit B** pp. 338-39) and meeting with RMA and City Legal personnel (**Exhibit B** p. 153), Johnson advised Wray on Friday, January 6, 2006 that he was placing him on administrative leave pending further investigation. Wray tendered his resignation from GPD on Monday, January 9, 2006. (**Exhibit B** pp. 134-35).

On January 10, 2006, the City Council voted to authorize Johnson publicly to release a statement (**Exhibit I**) relating to the investigations of GPD that Johnson had ordered. Johnson's "Manager's Statement Released to Restore and Maintain Public Confidence in the Wake of Chief David Wray's Resignation" included admissions that the SID officers who were assigned to investigate black GPD officers[17] under Wray:

> were not operating within the normal chain of command and failed to follow established departmental rules and procedures. While it is now clear

---

[17] At all times during the Wray administration there were at least two black detectives assigned to SID. However--other than the bogus investigation of Snipes assigned to Rankin and Cuthbertson--black SID detectives were excluded from assignments to officer investigations under Wray. (**Exhibit J** p. 177).

-35-

that members of Wray's own staff, and credible representatives of outside law enforcement agencies communicated concerns about this activities to the Chief, but he did not communicate these concerns to the City Manager or take action to correct the situation. *The activities of this unit and its continued pursuit of unproven, previously investigated and unsubstantiated charges against certain African American officers created an atmosphere of fear, distrust and suspicion which undermined the department's morale and efficiencies.*

(**Exhibit I** p. 4 ¶ 3) (emphasis added). Johnson, as City Manager, was the highest

ranking staff member within the City, and its chief personnel officer, when he made these

statements. (**Exhibit B** pp. 61, 156).

### 7.    Removal of Chain of Command

A chain of command within a police department helps to prevent corruption.

**Exhibit P** p. 41 (Craig McMinn, who supervised approximately 22 criminal

investigations of GPD officers, testified, "[I]f you have the built-in checks and balances

in [officer investigations], things generally go smoothly"; "They're there for a reason") ;

*see also* McMinn p. 69 (bypassing the chain of command creates a risk of an

investigation being conducted inappropriately).

Ball took issue with Wray administration's failure to adhere to the chain of

command. (**Exhibit K** pp. 37-38). He met with Brady to discuss his concerns on this

issue. (*Id.* p. 38).

McMinn, who on paper was Sanders' supervisor, did not know what Sanders was

doing. Beginning in 2002, Sanders was investigating James Hinson with respect to an

alleged assault and prostitution at his bachelor's party, reporting directly to Brady,

without McMinn's knowledge of what he was doing on a daily basis. (**Exhibit P** p. 36;

-36-

**Exhibit K** p. 59). This made McMinn uncomfortable. (**Exhibit P** p. 27).

The covert nature of Wray's investigations of black officers, combined with the removal of the chain of command, was unprecedented in Ball's 30 years at GPD. (**Exhibit K** p. 62; **Exhibit L** page 4645).

The covert nature of Wray's investigations of black officers, combined with the removal of the chain of command, "can get your ass in a bind real quick if you're not careful." (**Exhibit K** pp. 59-61; **Exhibit L** page 4645). "You're setting yourself up for a lot of problems when you're running covert internal investigations without precedent or establishment or policies and procedures. That was all thrown out the window." (**Exhibit K** p. 62; **Exhibit L** page 4645).

8. <u>Removal of Internal Affairs' Supervision of Officer Investigations</u>

Historically the commander of Internal Affairs was privy to every aspect of officer investigations, every step of the way, and was a clearinghouse for information relating to these investigations. I.A.'s involvement in officer investigations "had been in place for many, many years." (**Exhibit K** pp. 64-65; **Exhibit L** pages 4647). However, under Wray, I.A. Commander Crotts was "totally taken out of it." (**Exhibit K** p. 63; **Exhibit L** bates stamp pages 4645-46 ; *see also* **Exhibit K** p. 69).

SID was formally moved from the command of Captain Crotts directly under Brady in 2004. (**Exhibit S** pp. 29-33). Wray justified the move as somehow involving "Homeland Security" concerns, but Captain Crotts saw no substance in this explanation. (*Id.* p. 34). In practice, Captain Crotts, along with Sergeant McMinn, had been already been taken out of the loop of Sanders' internal investigations. (*See* **Exhibit K** p. 69; Ball

-37-

Dep. Exh. 127 bates stamp page 4649) (move of SID to report directly to Brady was an

effort to "make this look official . . . to kind of justify what [the Wray administration had]

been doing all along"). Brady was given responsibility to supervise SID's investigations

of black officers despite the facts that (1) he had little investigative experience (McMinn

p. 41), and (2) the change removed the built-in checks and balances created by a normal

chain of command (McMinn pp. 41-42).

### 9.    Photographs of Black GPD Officers Shown Indiscriminately to Criminals and Others

Two reliable informants that Assistant Chief Bellamy had known for years, since

his days in Vice/Narcotics, advised him in late 2004 and 2005 that white GPD officers

were going around showing photographs, stored in a notebook or folder, and asking

questions about black GPD officers.[18] **(Exhibit O** pp. 77, 81-83). Both informants had

been personally shown photographs of black officers by white GPD officers. (*Id.*)

### 10.    Tracking Devices

The GPD Defendants admit that they placed tracking devices on the vehicles of

two of its officers during the Wray administration. Both of those officers were black.

(Wray pp. 140-41). And the tracking devices were placed on those officers' vehicles for

the flimsiest of reasons: GPD placed a tracker on Fulmore's vehicle before the hotel

incident because he was reported to be having an extra-marital affair with a woman who

---

[18] Hence Bellamy—Wray's Assistant Chief—had reliable information that SID was
engaged in a fishing expedition to gather some information of wrongdoing by black GPD
officers by, *inter alia*, displaying their photographs, but Bellamy did not even mention
this fact to Wray or take other action. *See* Wray pp. 158-59 (Wray testified that Bellamy
did not advise him of the reports Bellamy received from his confidential informants, and
that if Bellamy would have so advised him, "I would say he's mistaken").

-38-

lived in the general area (within a block) that a drug raid had occurred. (Crotts pp. 134-39). A detective, possibly Sanders, provided this information to Crotts and said that as a result the tracker needed to be installed. (Crotts p. 139). And GPD installed a tracking device on James Hinson's vehicle because he requested that a particular female with a criminal background be placed into a program called H.E.L.P. designed to rehabilitate prostitutes. (Wray pp. 138-39). Sanders monitored the tracking devices in both situations. Despite his painstaking work to track the movements of Fulmore and Hinson, the tracking devices yielded no evidence supporting either of the allegations justifying the trackers.

## ARGUMENT

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]he party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine [dispute] of material fact." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (citing *Celotex*, 477 U.S. at 323). When assessing a motion for summary judgment, the court considers "the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, if any." *Boitnott v. Corning Inc.*, 669 F.3d 172, 175 (4th Cir. 2012). The court views all facts and draws all reasonable inferences therefrom "in the light most favorable to the nonmoving party." *Newport News Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423, 434 (4th Cir.),

-39-

*cert. denied*, 132 S. Ct. 575 (2011); *Wray v. City of Greensboro*, 2013 U.S. Dist. LEXIS 117361, 13-14 (M.D.N.C. Aug. 19, 2013). "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012).

## I.      PLAINTIFFS HAVE ADDUCED AMPLE EVIDENCE OF A RACIALLY HOSTILE WORK ENVIRONMENT.

In order to survive summary judgment on his claims for hostile work environment, Plaintiffs must establish that "a reasonable jury could find" harassment attributable to the City that is "(1) unwelcome; (2) based on race; and (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-84 (4th Cir. 2001) (citing *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998). There is no "mathematically precise test" that determines when conduct violates Title VII, instead, an analysis of all of the circumstances must be undertaken. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22-23 (1993). The facts and circumstances in this case make it clear that, at a minimum, genuine issues of fact exist as to whether the hostility to which the Plaintiffs and other black GPD officers were subjected in the Wray administration was based on race and was severe or pervasive.

Genuine issues of fact also remain, moreover, as to whether the City prevail on the affirmative defense set forth in the *Faragher/Ellerth* cases.

### A.      The Summary Judgment Evidence Shows the Hostility Under Wray Was Based on the Plaintiffs' Race.

-40-

Defendants contend that there is no evidence that the hostile workplace under

Wray was due to their race. Rather, they urge that all GPD officers during Wray's tenure

as Chief, regardless of race, were equally subject to the hostility. (City's M.S.J. Brief pp.

8-10). This assertion bears little discussion. The Plaintiffs have come forward with

evidence that Wray surrounded himself with an inner circle of exclusively white officers

and excluded his black command staff from the decision-making process. They have

shown that Wray and Brady directed, and Sanders engaged in, zealous criminal

investigations of black officers, often based on the flimsiest of allegations, in an effort to

prosecute them. Allegations of white officers' criminal misconduct, in contrast, were

swept under the rug. Defendants created lineups of black officers. They showed lineups

and photographs of black officers to criminals and others. They followed black officers,

placed tracking devices on black officers' vehicles, and installed keystroke monitoring

devices on black officers' computers. They did none of these things to white GPD

officers.

 The City points out that some Plaintiffs experienced racism in the workplace

before Wray became Chief. (City's M.S.J. Brief pp. 7-8). The racial hostility in the Wray

administration, however, was from the top down. Black officers were specifically

targeted by the Chief, his Deputy Chief, and their minions, based only on their race. The

fact that racism existed in GPD before Wray became Chief does not excuse Defendants

for the severe and pervasive racially hostile environment during the Wray administration.

 The City also misses the point when it suggests that Plaintiffs contend that Wray

should have had non-white friends. (City's M.S.J. Brief pp. 10-11). The evidence shows

-41-

that Wray's inner circle of exclusively white officers were meeting not only socially, but doing business at the GPD headquarters on a weekly basis, behind closed doors. Black officers were excluded, to the detriment of their performance.

The City's argument, based on Sanders' testimony that he investigated the same number of white and black officers, that Defendants did not target black officers is unsound. (City's M.S.J. Brief pp. 11-12). Defendants pursued black GPD officers to try to put them in jail. Their efforts with respect to their white officer colleagues was much different—to clear them.

It makes little difference, for purposes of establishing a hostile work environment, whether a particular Plaintiff was actually excluded from command staff meetings, whether or not a particular Plaintiff was criminally investigated under Wray, whether a particular Plaintiff was the subject of surveillance, or whether or not a particular Plaintiff's photograph was included in a lineup book or otherwise presented to criminals and/or others. Each Plaintiff was aware of, and emotionally affected by, the racially motivated misconduct. And most or all Plaintiffs were themselves in fear that they were or would be a target of the racially hostile actions taken under Wray.

The claims are timely, under *National Railroad Passnegers Corp. v. Morgan*, 536 U.S. 101, 117 (2002).

**B.**   **The City is Not Entitled To Summary Judgment Based on the**
      ***Faragher/Ellerth* Affirmative Defense.**

Case 1:09-cv-00934-TDS-JEP   Document 198   Filed 09/27/13   Page 42 of 45

A number of Plaintiffs, as discussed in the Appendices filed herewith, suffered a "tangible employment action" such as a "reassignment with significantly different responsibilities" or a demotion, etc.

Whether or not a tangible employment action was involved, the record is clear that GPD's anti-harassment policies were ineffectual.  Brown v. Perry, 184 F.3d 388 (4th Cir. Md. 1999)  (any anti-harassment policy offered to satisfy the first prong of the Faragher-Ellerth defense must be "both reasonably designed and reasonably effectual.") Complaints were made to the top official in GPD and the top official in Greensboro government, but were not heeded.  Only when the SBI confronted Johnson did he order an investigation.

## CONCLUSION

For all of the reasons stated, the Court should deny the motions for summary judgment filed by Defendants the City of Greensboro and Trudy Wade.

Respectfully submitted, this the 5th day of September, 2013.

OF COUNSEL:

HIGGINS BENJAMIN, PLLC
101 West Friendly Ave., Suite 500
Greensboro, NC  27401
Telephone: 336-273-1600
Facsimile:  336-274-4650
jbloss@greensborolaw.com

/s/ John F. Bloss
John F. Bloss (NC Bar #23947)

KNIGHT & FREE, PLLC
416 Eugene Court
Greensboro, North Carolina 27401

/s/ Jason A. Knight
Jason A. Knight (NC Bar # 27271)

-43-

Telephone Number: (336) 279-8915                /s/ Kenneth A. Free, Jr.
Facsimile Number:  (336) 279-8914               Kenneth A. Free, Jr.

                                                *Counsel for Plaintiffs*

-44-

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification and a copy of such filing electronically to the following: Alan W. Duncan, Esq., Allison O. Van Laningham, Esq., Patrick Kane, Esq., Seth Cohen, Esq., Kenneth R. Keller, Esq., George W. House, Esq., Esq., William P.H. Cary, Esq., and Charnanda Reid, Esq., attorneys for defendants.

This, the 5th day of September, 2013.

/s/ John F. Bloss

-45-

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 2nd day of June, 2014, I caused this Supplemental Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Anita S. Earls
> SOUTHERN COALITION FOR SOCIAL JUSTICE
> 1415 West Highway 54, Suite 101
> Durham, North Carolina 27707
> (919) 323-3380
>
> *Counsel for Appellants*

I further certify that on this 2nd day of June, 2014, I caused the required copies of the Supplemental Joint Appendix to be hand filed with the Clerk of the Court.

/s/ Patrick M. Kane
*Counsel for Appellee*